J. G. WILSON, *Clerk.*

HENRY MARLIN, Plaintiff, *v.* W. G. T'VAULT, JOHN FLEM-
MING and THOS. G. ROBINSON, Defendants.

*Action on Bond.—Reserved from Washington.*

1. The act of Congress of May 23d, 1844, relative to town sites, was never in force, or applicable to the land system in Oregon.
2. Lands upon which there had been the requisite settlement and cultivation under the provisional government, though held as town sites when the act of 27th September, 1850, was passed, may be held as donations under that act.

*J. K. Kelly,* for plaintiff.

*A. Campbell,* for defendants.

WILLIAMS, C. J.   On the 18th day of February, 1847, de-
fendants made to plaintiff their bond, reciting that plaintiff
had conveyed to them a certain land claim in Tuality County,

and received therefor a block of ten lots in the town of Columbia and county of Vancouver, and binding themselves, under the penalty of $1,000, to comply with all the requisites of the act of Congress granting donations of land to settlers in Oregon, so as to acquire title to said block, and then to convey, &c.   The declaration avers that defendants have not in any way complied with said law, or obtained and made title to plaintiff according to the stipulations of said bond. Defendants demur, and for cause in the first place say, that at the date of said bond there was no act of Congress granting donations of land to settlers in Oregon.   Words " *in presenti* " must have a future application where such is the obvious intention of those who use them.   Courts proceed upon the presumption that all persons know the law, and we must therefore conclude that the parties to this bond, knowing the law, knew that it did not at that time provide for donating lands to settlers in Oregon.   Public history in this territory, of which we may take judicial notice, shows that at the time this bond was made, it was expected that such a law would be enacted by Congress, and upon this understanding we must suppose the parties made their contract.   There is an evident grammatical mistake in the phraseology of the bond; but defendants, having received plaintiff's property, ought not to be allowed to defeat his right to an equivalent therefor on any such ground.   .

In the second place, it is said that, between the bringing of this suit on the 21st of October, 1853, and the first day of the ensuing December, defendants had a right to take a claim, and therefore this suit is brought before any complete failure or disability to comply with the bond exists on the part of the defendants.   Section 12 of the donation act provides, that persons claiming under such act, by virtue of a settlement and cultivation subsequent to December 1st, 1850, shall first make affidavit " that the land claimed by them is for their own use; that they have made no sale or transfer, or any arrangement or agreement for any sale, transfer or alienation of the same, or by which said land

Marlin *v.* T'Vault.

shall enure to the benefit of any other person." Defendants could not, therefore, make any necessary affidavit to enable them to claim the land by virtue of a settlement, after December 1st, 1850, for they had made arrangement "for the sale of said land, and by which it was to enure to the benefit of another person."

In the third place, it is said that plaintiff seeks to make defendants liable for not doing, under the act donating lands to settlers in Oregon, what said act would not allow them to do. Nothing in law prevented defendants from taking the claim prior to the 1st of December, 1850, for the purpose of complying with the bond; and if it had been so taken, and legally held, title thereto might have been acquired for the use of plaintiff. But it is said defendants were not able to perform the obligation of their bond, because town sites cannot be taken and held under the donation act, and a late opinion by the commissioner of the general land office is cited in support of this position. Defendants, it appears, made the plan of a town, which they called Columbia, and sold a block to plaintiff; but there is nothing to show that there ever was a house in said town, or any thing to prevent the cultivation of every foot of the soil on which it was laid out. Imaginary lines, though running at right angles, will in no way interfere with such a settlement and cultivation as the donation act requires, and therefore their existence forms no excuse for the delinquency of defendants. For aught that appears, the land upon which this town was marked out had been taken and used as a farm long before the idea of a town was conceived; if so, the mere mapping it out into blocks and lots can make no difference with the right to hold it under the donation act. Commissioner Wilson places the opinion referred to upon the following grounds:

1st. The act of 14th August, 1848, establishing a territorial government for Oregon, " shuts out " all claims under the territorial laws prior to its enactment.

2d. By said act of Congress, the laws of the United States were declared in force in this territory, so far as the same, or any provision thereof, might be applicable.

3d. The act of 23d of May, 1844, relative to town sites upon the public lands, being a law of the United States, was put in force here by said act of 1848, so that town sites were to be entered by certain public authorities, and not subject to be held as donation by private persons.

4th. That donations of land, under the act of September 27th, 1850, are only made for agricultural purposes.

We propose briefly to examine this opinion, and, relative to the first point on which it rests, have to say, the 14th section of the act establishing a territorial government for Oregon, provides " that all laws heretofore passed in said territory, making grants of land, or otherwise affecting the *title* to lands, shall be null," &c. Manifestly this provision abrogates any law of the provisional government granting or affecting title to land, but *non constat* that it repeals all laws regulating the possessory right of settlers, acquired under such government. Prior to the passage of said act, many persons had taken and largely improved claims under the laws of the provisional government; and it must be supposed that Congress did not intend to leave these claims without any legal protection, but simply intended to assert and protect the rights of the United States. Congress did not mean to say that the claim laws of the territory should be void as between the citizens thereof, but that such laws should not bind or encumber the title in the United States. If, then, the act of 1848 does " shut out " all claims, it only shuts out the right as against the United States, and not the right of a settler to hold his claim and improvements against a wrongdoer attempting to dispossess him. Commissioner Wilson takes no notice whatever of those parts of the donation act which expressly recognise and adopt claims made under the laws of the provisional government. If the act of 1848 vacates such claims, as is alleged, the act of 1850 certainly makes them valid ; and, so far as there is confliction between the two acts, the provisions of the act of 1850 must, of course, prevail. Section 4 of said act of 1850 grants to those " who shall have resided upon," &c., and also provides that the heirs of settlers

dying before patent issues, shall inherit, whether such descendants complied with the law "under the late provisional government or since." Section 7 of said act requires the surveyor-general to issue certificates upon the necessary proof of settlement and cultivation, "whether made under the laws of the provisional government or not." Whatever effect, therefore, the act of 1848 may have had upon claims made prior to that time, the act of 1850 clearly saves and protects them, and, for the purpose of obtaining a certificate, makes a residence and cultivation under the provisional government just as good as residence and cultivation under the Congressional government. No man can fall into a greater mistake than to suppose that the surveyor-general of this territory, in adjusting the rights of settlers to land here, is bound to ignore all rights acquired under the laws of the provisional government. When Mr. Wilson says that "land occupied as a town site, or for purposes of trade, prior to the act of 1850, is not subject to donation under this act," he lays down a proposition which cannot be maintained. Suppose that on the 1st of October, 1850, after the passage of the donation act, a qualified person settles upon and cultivates a claim till October, 1852, and then changes it into a town site, can the surveyor-general, for that reason, refuse to give him a certificate, when the residence upon and cultivation of any part of said claim are continued by such person as long as said act required? Clearly not, as any man of common sense must see. Now, let it be remembered, that the act of 1850, so far as this point is concerned, puts the rights of those who settled before its passage, and the rights of those who settled afterwards, upon precisely the same footing; so that whatever would not invalidate a settlement made after such act took effect, would not invalidate a settlement made prior to that time. If this argumentation be correct, it follows that, if said qualified person had made his settlement in 1847, and laid off a town in 1849, (residing and cultivating as in the above supposed case,) his rights under the donation law would be exactly the same as in that case.

Suppose a settler to have taken a claim of 640 acres in 1845, and to have resided upon and cultivated it for four consecutive years, and then, in 1849, to have laid it off into a town, in which he continues to reside; when such settler applies for a certificate, would it be the duty of the surveyor-general to say to him, it is true you have complied with the law in every respect, but you have forfeited every thing in attempting to build up a town, for "land occupied as a town site, prior to the act of 1850, is not subject to donation under that act?" Emigrants, from the first, came to Oregon with the idea that the lands here would be donated to them, and the first comers, having choice of the country, would, of course, select such claims as, in their opinion, would be most valuable in the future growth of the territory. Suppose one of these early settlers to have taken a claim with the belief that it would, in process of time, be a good location for a town, and the course of events has proven the correctness of his judgment, is there any good reason why such settler should not have the fruits of his labor in fitting said place for a town, and the benefit of his foresight in the selection? . He has a perfect right to admit persons to occupy under him, or to exclude them; and if he does so admit persons for the public good, ought his rights against the government to be less than they otherwise would have been? The public use of part of a claim is not inconsistent with such a residence and cultivation by a settler as the act of 1850 contemplates. Suppose a man to take and duly notify for a claim of 640 acres, and then reside upon and cultivate forty acres, with the avowed purpose of holding the whole, does the manner in which he may use the residue of such claim make any difference with his right to a certificate for the entire section? Certain it is, that if the said 600 acres were left in a state of nature, his right would be as perfect as to the forty which he had fenced and ploughed; and ought anybody, much less the government, to object if the settler, instead of letting lands in his possession lie in a wild state, puts them to any use of profit to himself, and of advantage to the public? Residence upon

Marlin v. T'Vault.

and cultivation of a part of a claim, with the *bona fide* intention of holding and securing title to the whole, is all that has ever been required, where "settling upon" is made the mode for acquiring lands of the United States. When a man settles upon vacant land in Oregon, and his possession thereto becomes property, which the laws of the territory will protect, he must be allowed to hold such land against all junior claims, provided he complies with the donation act. No person can lawfully enter upon such a settler's claim without his consent; and if persons by means of such consent do get in as town residents, tenants, or in any other way, ought they be permitted to turn round and deny the right of him under whom they hold? "Prior in time, prior in right," though a maxim in equity, is the only safe and certain rule that can be applied to settlers in Oregon, all other things being equal.

Is the act of 1844 applicable to town sites in Oregon? On the 9th of September, 1850, Congress established territorial governments for Utah and New-Mexico, and, as in our act of 1848, declared the laws of the United States in force in said territories as far as applicable, &c. President Pierce, in his first message to Congress, says: "I recommend the extension of the land system over the territories of New-Mexico, Utah," &c. Commissioner Wilson, in his report accompanying the message, says: "The expediency and propriety of early action for the extension of the land system over the territories of New-Mexico and Utah is suggested and recommended." Now, if the land system did not go to New-Mexico and Utah by force of their acts, it certainly did not come to Oregon by force of ours, for the language is the same in all the acts. This act of 1844 is a part of said "land system," and only acts with the system to which it belongs. Disjointed and standing alone here, it would operate about in the same way as the separate wheel of a watch serves to keep time. It is well known that there are no land system and land laws in Utah and New-Mexico, and there were none in Oregon till the act of 1850. That was a system of donating and not selling lands to settlers, and the laws of the selling system, there-

fore, seem inapplicable.   The act of 1844 provides, that when
any part of the "surveyed" public lands shall be occupied as
a town site, &c.   The town sites of Oregon were made upon
"unsurveyed" public lands.   Mr. Wilson, however, argues
that the distinction between surveyed aud unsurveyed lands
is inconvenient, and, therefore, does not exist.   Will the
commissioner abolish the difference between such lands in all
constructions of the donation act?   By the act of 1844,
county courts and city governments are to " enter town sites
at the proper land office at the minimum price," &c.   Now,
what is the minimum price of lands in Oregon ?   How can
lands be entered at the surveyor-general's office ?   What
law authorizes him to receive moneys for land ?   Can he
grant a certificate except for residence and cultivation, and
how is it possible for a county court or city government, as
such, to reside upon and cultivate a town site ?   Again, these
town sites, under the act of 1844, are to be entered " before
the public sale of lands in which they are included is com-
menced."   When did the public sale of lands around the
towns of Oregon commence ?   If it never has commenced, it
certainly never will, for such lands have become private pro-
perty under the donation act.   Manifestly, therefore, there
never was and never will be a time when town sites in Ore-
gon could or can be entered in accordance with said act of
1844, and will it on that account be pretended that the com-
missioner, or any other officer, can cut and carve as he pleases
to meet some supposed public exigency, and say that one
provision of the act is in force, and all other provisions of the
same act, because inconvenient, are void ?   No part of the
pre-emption system, it is quite clear, was ever in force in
Oregon.   No land districts were ever laid out, or land offices
established by Congress, where lands might be entered.   No
claims were ever taken with reference to such laws, and no-
body ever dreamed of being governed by them until the late
decision of the commissioner as to town sites.

The pre-emption laws of 1838 and 1841, and the California
land law, except town sites from private entry ; but the Ore-

Marlin *v.* T'Vault.

gon act, while it excepts mineral lands, salines, &c., like the other laws, says nothing about town sites.  Why this difference in form unless some difference in fact is intended ?  The act of 1850 specifically grants the " Oregon City claim," showing that the subject was before the mind of Congress. All other claims seem to be left upon the same footing, to be given to those who could show a first possession, and a compliance with the donation act.  True, a person might take a claim for purposes of trade alone, and not be entitled to a certificate therefor, because " cultivation" is necessary to establish right.  So several persons may take simultaneous possession of a tract, and thus make it impracticable to give a certificate to either ; but the remedy for such cases, if they need any, is to be found in further legislations by Congress, not in far-fetched constructions by the general land office, " making confusion worse confounded."

Policy, the commissioner says, is as strong as the law in support of his opinion ; and so it is, and no stronger.  Let the common council of a city enter the land upon which such city is situated, then the legislature must prescribe " its rules and regulations," as to the disposal of the lots, and the proceeds of the sales thereof ; then the said common council, whose members, changing with every election, are more or less interested in the question, must examine and decide upon the titles, and thus years might elapse before contentions between owners would cease.  How much easier and quicker for Congress to authorize some disinterested person to act in the matter, as provided for lots sold in Oregon City prior to 1849.  Such special acts are not uncommon.  Titles in Burlington and Dubuque, in Iowa, and other towns in the west, were acquired under such legislation.

Again, people have universally acted upon the belief that the act of 1844 was not in force here.  Claims have been located, improvements made, homes secured, and moneys invested upon this assumption, and the effect of a contrary rule is now to unsettle rights, and strike a blow at the prosperity of nearly every town in Oregon.  If policy is to be consulted

in construing the donation act, it ought to be a policy as liberal to the first settlers of the country—to the men who braved the perils of the then unbroken wilderness—as to those who have since followed in their footsteps. Secretary McClelland, it appears, has decided adversely to the foregoing views, but such decision rests entirely upon the reasoning of Commissioner Wilson, and if such reasoning is good, so is the decision, otherwise not. These general views, fuller, perhaps, than the necessities of the case required, have been expressed to show in what light courts of law might regard the question. The other points made by the demurrer are entitled to no particular notice.

Demurrer overruled.