## Case No. 8,015.

LAMB et al. v. DAVENPORT et al.

DAVENPORT et al. v. LAMB et al.

[1 Sawy. 609.] [1]

Circuit Court, D. Oregon. May 20, 1871. [2]

CONSTRUCTION OF CONTRACTS — JUDICIAL KNOWL-
EDGE—POSSESSION — PUBLIC LAND — CONTRACTS
IN PARI MATERIA — WHOLE INSTRUMENT CON-
SIDERED—COVENANTS — TITLE VESTED IN TRUST
—BENEFICIARIES—CONTRACTS PRIOR TO OREGON
DONATION ACT — SUBSEQUENT AGREEMENT —
PRESENT GRANT — TRUST IMPOSED BY AGREE-
MENT—FUTURE CONTRACTS.

1. In construing a contract, courts will con-
sider the condition of things existing at the time it
was made, and with reference to which the con-
tract was executed.

2. Courts will judicially take notice of matters
of public history, such as the general condition
of the country, and of the titles to lands in Oregon
prior to the passage of the act of congress of
September 27, 1850 [9 Stat. 496], called the "Do-
nation Act."

[See note at end of case.]

3. As between individual citizens, rights to
the possession of the public lands have been recog-
nized and protected by the courts of the territo-
ries and new states, and of the United States,
and acquiesced in by the government.

4. Where several successive contracts are made
between the same parties in respect to the same
subject matter, and apparently in pursuance of
the same general purpose, they are in pari materia,
and may be read together, and considered in the
light of the surrounding circumstances, for the
purpose of ascertaining the intent designed to be
expressed by the parties in some particular cove-
nant in one of the contracts.

5. Where the language of the covenants in a
contract is more comprehensive than that of the
recitals, the intent will be ascertained from a con-
sideration of the entire instrument.

6. On March 10, 1852, Lownsdale, Coffin and
Chapman were in the joint occupation of a land
claim in Oregon, which had been laid out into
town lots, and before that time had jointly and
severally sold lots, or the possession of lots,
throughout the claim to divers persons, and to
one another, and thereupon, to enable themselves
to notify upon and obtain patents for separate
tracts of said claim under the donation act of Sep-
tember 27, 1850; said L., C. and C. entered into
an agreement to partition the land claimed be-
tween them, and also covenanted therein with
one another, that when they should obtain patents
to said separate tracts, each of them would make
good and sufficient deeds for all lots sold as aforesaid in the part or tract so patented to him: *Held,*
that said covenant, as to lots before sold by said
parties jointly, or by any of them separately, is a
covenant for the benefit of the vendees of said
lots, and those claiming under them, and not of
the covenantors themselves.

[Cited in Hardenberg v. Ray, 33 Fed. 818.]

[See note at end of case.]

7. Upon the acquisition of the title from the
United States by said Lownsdale, in pursuance
of said covenant and act of congress, the said
covenant to acquire the title for the benefit of the
said several vendees of the lots before sold be-
came executed, and the title thereto vested in said
Lownsdale, but in trust for the benefit of said
prior vendees.

[See note at end of case.]

8. The said prior vendees, for whose benefit the
said covenant was made and the title acquired
to said lots sold, are entitled to maintain actions
in a court of equity in their own names, to enforce
the trust and compel a conveyance of the legal
title.

9. Sundry agreements relating to the land en-
tered into by Lownsdale, Coffin and Chapman,
and each of them, prior to the passage of said
donation act, are valid contracts.

[See note at end of case.]

10. The said agreement containing said cove-
nant to acquire the title to lots sold, for the bene-
fit of the prior vendees of the parties to it, is not
a "future contract for the sale of the land," with-
in the meaning of the provisions of the fourth
section of the donation act, and is not made void
by the act; but the said agreement is valid.

[See note at end of case.]

11. As to existing settlements commenced be-
fore the passage of said donation act, the said
act is a grant in praesenti to the party entitled
under the act, and it vested the title in fee from
the date of its passage, subject only to be defeated
by a failure to perform the conditions subsequent-
ly prescribed in the act.

[Cited in Wythe v. Haskell, Case No. 18,118;
Sanger v. Sargent, Id. 12,319.]

[See note at end of case.]

12. The agreement aforesaid being executed as
between L., C. & C., and they and each of them
having an estate in the land at the date thereof,
which was partitioned and perfected by means
of said agreement and the action of said parties
thereunder, a trust was imposed upon the land
obtained by each of them in favor of the purchas-
ers, or their assigns, as to all the lots before that
time sold therein by either or all of them as afore-
said, which trust could be enforced in equity by
said purchasers or their assigns, although they
are mere volunteers from whom no consideration
moved in the premises. Per Deady, District
Judge.

13. The purchaser of a town lot from a land
claimant or settler, under the donation act, did
not contribute in any way to the acquisition of
the title by such settler—the mere possession of
such purchaser, whether actual or constructive,
being derived from and subordinate to that of the
settler, and being in itself not sufficient to enable
such purchaser to acquire the title to said lot
from the United States under the donation act,
as against such settler or otherwise. Per Deady,
District Judge.

14. The agreement of March 10, 1852, afore-
said, is not a "future contract for the sale of the
land" to which the parties thereto were entitled
under the donation act, but rather an agreement
concerning past sales and transactions, made for
the purpose of securing conveyances to be made
of lots therein, in pursuance of sales made prior
thereto, and is therefore not within the prohibition
against future contracts in section 4 of said act.
Per Deady, District Judge.

Bill in equity [by John R. Lamb and others
against I. A. Davenport and others,] and
cross-bill [by Isaac A. Davenport and others
against J. R. Lamb and others].

W. Lair Hill, W. W. Thayer, and E. C.
Bronaugh, for complainants in original bill.

W. W. Chapman and W. F. Trimble, for
Davenport, complainant in cross-bill.

Before SAWYER, Circuit Judge, and
DEADY, District Judge.

SAWYER, Circuit Judge. The complain-
ants in the original bill are a part of the
heirs of D. H. Lownsdale, deceased. As such

[1] [Reported by L. S. B. Sawyer, Esq., and
here reprinted by permission.]
[2] [Affirmed in 18 Wall. (85 U. S.) 307.]

heirs they claim to be seized in a fee of undivided parts of lots 2, 5, 6 and 7, in block 13, in the city of Portland; and the object of the bill is to obtain a partition. A larger tract of land, embracing the lots in question, was patented by the United States to said D. H. Lownsdale, deceased, June 15, 1865, under the act of congress of September 27, 1850, relating to public lands in Oregon, commonly called, the "Donation Act." The other heirs, and I. A. Davenport are made defendants—the latter because, as is alleged, he claims some interest in the land, through one Stephen Coffin, and, also, some equitable title derived from said Lownsdale; but it is denied that he has any interest, legal or equitable; and a decision is asked that the question of title be determined, and that the lands may be partitioned.

Davenport answers the bill, and then files a cross-bill against the heirs of said D. H. Lownsdale, deceased, in which he sets up a state of facts, which, he insists, establishes an equitable title to said lots 2, 5, 6 and 7 in block 13, in himself, and prays that it be decreed, that the said heirs of Lownsdale, defendants in the cross-bill, hold the legal title to said lots in trust for said Davenport; that they be enjoined from further setting up any claim of title thereto, and that they convey the legal title to said Davenport. It is conceded that the legal title is in the heirs of Lownsdale, and that they are entitled to the partition prayed for, unless the matters set up in the cross-bill are true in fact and sufficient in a court of equity to entitle the complainant therein to the relief demanded.

The following facts, among others, are alleged in the cross-bill, and either admitted by the answer, or satisfactorily established by the testimony. Prior to March 30, 1849, said Daniel H. Lownsdale was, under the rules, regulations and usages, as they existed under the provisional and territorial governments of Oregon, the owner, and in possession, of a land claim, purchased by him of one Pettigrove, containing six hundred and forty acres of land, known as the "Portland Land Claim," on the left bank of the Wallamet river, in the then county of Tuality, with valuable improvements thereon—said possession of the land and claim dating from September 22, 1848. The premises in controversy are embraced in the land so possessed and claimed by said Lownsdale. Prior to said March 30, 1849, said Lownsdale, or his grantor, had laid off a town called "Portland," on said land, so possessed and claimed by him, of sixteen or more blocks, numbered consecutively from one to sixteen, or more, said blocks being sub-divided into lots of fifty feet by one hundred feet; among which blocks and lots were said blocks 13, and the lots in question; and he had been engaged in the business of selling town lots, so laid off, and deriving profit therefrom. On the said March 30, 1849, said Lownsdale executed and delivered to Stephen Coffin an instrument in writing, of which a copy is annexed to the cross-bill, and designated "Exhibit A,"—said instrument purporting to bargain, remise and release to said Coffin, the said Portland land claim of six hundred and forty acres, in possession of said Lownsdale as aforesaid, with an exception of certain lots and blocks therein enumerated, reserved and excepted, as having been previously sold, to different persons, as town property. On the same day, at the same time, and as a part of one and the same transactions the said Lownsdale and Coffin mutually executed and delivered another instrument in writing, a copy of which is annexed to said cross-bill, and therein designated, as "Exhibit B," which is as follows:

"This article of agreement made and entered into between Stephen Coffin, of Oregon City, of the territory of Oregon, of the first part, and Daniel H. Lownsdale, of the other part. Witnesseth: that the said Stephen Coffin, for and in the consideration of the sum of three thousand dollars paid to him by the said Daniel H. Lownsdale, in good and lawful money, agrees to make exertion to obtain a title from the United States to six hundred and forty acres of land, where the town of Portland is situated, in Tuality county, and to divide the proceeds of any sales of lots or other property or privileges now in and to the said land claim and town property, or may hereafter be attached thereto, and to bear half the expenses of any improvements they may jointly agree to make on said claim, and in every lawful exertion to further the interest of the said town site, and the said Daniel H. Lownsdale hereby agrees to furnish his half of any moneys necessary to secure the title from the United States, and use his exertions to further the said town property, by every lawful exertion personally, whenever it is in his power so to do, by assistance in the transaction of business when present, or in other countries, and pay one half the expenses of any improvements the said Stephen Coffin and said Daniel H. Lownsdale shall jointly agree to make on the claim as sold by Daniel H. Lownsdale to Stephen Coffin; it is also jointly agreed that all the profits and all the losses, all the rents and all the proceeds from sales shall be divided equally by the said parties, as long as these articles shall be in force, which shall be until dissolved by mutual consent. At which time of dissolution of these articles, the said Stephen Coffin hereby agrees to execute to the said Daniel H. Lownsdale, a good title to the one half of the beforenamed claim of land and all the improvements thereon, in accordance to the title he now may or then may have obtained, to hold said land and town site purchased this day from said Lownsdale. The parties further agree that they will, at the close of every month, make settlement on all business, and proceed to divide the profits and losses as beforesaid, and each of the parties agrees to act as agent,

and keep a record of their proceedings and exhibit them, as above described, at their quarterly settlements."

On June 8, 1859, said Coffin, being about to be absent from Portland for a time, in San Francisco, executed in due form, and delivered to said Lownsdale, an instrument in writing, a copy of which is annexed to said cross-bill and designated as "Exhibit C." Said "Exhibit C" is a power of attorney, under seal, by which said Lownsdale, as the attorney in fact of said Coffin, is empowered to "sell on time any personal or real property whatever," and generally to transact all manner of business for said Coffin. On June 18, 1849, by virtue of this power of attorney, said Lownsdale, in the name of said Coffin, executed and delivered to John J. Marshall an instrument in writing of which a copy is annexed to said cross-bill, and designated as "Exhibit D." Said instrument is a deed of conveyance by which the said Coffin, by said Lownsdale, his attorney in fact, in consideration of the sum of six hundred dollars, the receipt of which is acknowledged, "bargained, sold and quit-claimed unto said J. J. Marshall, his heirs and assigns forever, all those lots or parcels of land, including an entire block containing eight lots, lying and being in the town of Portland, known on the plat of said town as block No. 13," etc., being the block mentioned in the bill and cross-bill by that number; and it contains the covenant that, "I will forever warrant and defend the same against all other persons claiming the same through or by me or my heirs whatsoever." Shortly after the date of the last mentioned instrument, said Marshall, at San Francisco in California, for a valuable consideration, sold the south half of the said block No. 13, embracing lots 3, 4, 5, and 6, in said block, to D. B. Fowler, and the north half, embracing lots 1, 2, 7 and 8, he resold to said Stephen Coffin, for which he received the purchase money.

As the said deed from Coffin to Marshall had not been recorded, the said deed was redelivered by said Marshall to said Coffin, with intent to re-vest the title in him, and with the understanding that said Coffin should deed the said south half of block 13 to the said Fowler, in pursuance of said sale; and thereupon, on November 10, 1849, said Coffin, in pursuance of said agreement, by deed duly executed and delivered, directly conveyed lots 3, 4, 5, and 6 to said Fowler. A copy of said deed is annexed to said cross-bill, and designated as "Exhibit E." Said Coffin in said deed covenants to warrant and defend said premises against all and every person, or persons, whomsoever, claiming title by, through, or under said Coffin, or his heirs. Afterwards, on January 14, 1854, said Fowler conveyed said lots 5 and 6 to said Davenport, complainant in the cross-bill, by deed, a copy of which is annexed to said cross-bill and designated "Exhibit K." On December 13, 1849, said D. H. Lownsdale, Stephen Coffin and W. W. Chapman entered into an agreement, or contract, in writing under seal, a copy of which contract is annexed to said cross-bill, and designated "Exhibit L." Said contract recites that, "said Lownsdale and Coffin are joint owners of the town of Portland, and the claim upon which said town is situated," and provides that, "The said Coffin, Lownsdale and Chapman are to be equal partners in the above described property, excepting town lots already sold previous to this date, as town property;" also as follows: "In all matters pertaining to the partnership, the legal advice and counsel is to be free of charge on the part of said Chapman. A book and plat of said town shall be kept at Portland by the parties, and regular entries made in said book of sales, receipts, and expenditures. The parties shall make mutual arrangements, from time to time, for the proper use of the funds of the firm. The parties shall take such steps for obtaining title from the government as they may mutually agree upon."

Afterwards, on January 18, 1851, said Coffin duly executed and delivered, to one Mills, a deed of conveyance, a copy of which is annexed to said cross-bill and designated "Exhibit H," by which deed he "doth grant, bargain, sell, release and confirm unto the party of the second part (Mills), his heirs and assigns, lot 2, in said block 13, to have and to hold the said lot, to said Mills, his heirs and assigns forever," and he therein covenants to warrant and defend the property against the claims of all persons the United States excepted, and that if he obtains title of the United States, to convey the same to the party of the second part, by deed of general warranty. On May 15, 1851, said Coffin executed and delivered to one Cheeny, a deed of conveyance, a copy of which is annexed to the cross-bill, and designated "Exhibit F," by which he conveys lot 7, in said block 13, to said Cheeny, in the same form and with the same covenants as found in said deed to Mills. By proper mesne conveyances, copies of which are annexed to the said cross-bill, all the title to said lot 7, and rights derived by said Cheeny under said deed, became vested in said Davenport, October 7, 1856; and all the title to said lot 2, and all the rights derived by said Mills, became vested in said Davenport, January 2, 1857.

On March 10, 1852, said Lownsdale, Coffin and Chapman entered into a further contract, or agreement in writing under seal, a copy of which is annexed to said cross-bill, and designated "Exhibit M," in which, after reciting that the said parties have heretofore, up to the date of these presents, been joint proprietary claimants of the tract of land, etc., "being the same tract which the said Lownsdale originally purchased of Francis W. Pettigrove, and upon which a part of the city of Portland is laid out;"— that "said Lownsdale, Coffin and Chapman

have sold lots in said city of Portland to each other, and to third persons, obliging themselves to make to the grantee, or grantees, a deed of general warranty whenever the grantor shall obtain a patent from the government of the United *States for the same;"—that it has become necessary, in order to comply with the donation law, that "the said parties shall designate before the surveyor-general of Oregon the particular portion or part of said Portland tract, which each, by agreement with the others, respectively claims, in order that he may obtain a patent therefor from the government of the United States," etc.—the said parties each covenants with each of the others; their heirs, etc. "1st. That he will fulfill and perform all contracts and agreements which he has heretofore entered into with the others, or either of them, or with other persons, respecting the said tract of land or any part thereof. 2d. That he will never abandon or remove from the claim which he, simultaneously with the signing and sealing hereof, shall make before said surveyor-general, to a portion of the said Portland tract, until he shall obtain a patent therefor from the government of the United States, that is to say: 3d. That he will use all due diligence to procure a patent for the same, and that to this end he will in all respects fulfill and perform the requisites of the law upon this subject; and 4th. That when a patent shall be so obtained, he will make good and sufficient deeds of general warranty for all lots, or parts of lots, in the part or tract so patented to him, which may heretofore have been sold or agreed by said parties jointly, or any of them separately, to be sold; that said deed, of course, in all cases to be made to the original grantee, his heirs, executors, administrators or assigns, grantee or grantees, as the case may be."

They then, for the faithful performance of the covenants, "bind themselves, each unto the other, in the penal sum of three hundred thousand dollars, as fixed and settled damages to be paid by the party failing to the party or parties injured," etc.

On the next day after the execution of said instrument, to wit: March 11, 1852, said Lownsdale filed his notification with the surveyor-general, by which he designated the particular portion of said tract which he claimed to enter under said agreement, and in pursuance of such designation and claim, the proper certificate from the land office was issued to him, October 17, 1860, and thereupon a patent of the United States duly issued to said Lownsdale, June 15, 1865, under and in pursuance of the provisions of said act of congress before mentioned, commonly called the "Donation Act." Said notification, certificate and patent embraced said block 13. On the same day said Chapman, and on a subsequent day said Coffin, duly filed their said notifications. Said Lownsdale's claim of settlement dated from September 22, 1848, and, from that date, for a period of four years, the said Lownsdale, either alone or in connection with said Coffin and Chapman, or one of them, occupied and improved portions of the land embraced in said general claim. The said Lownsdale, before the said conveyance to and agreement with said Coffin, and said Lownsdale and Coffin, from the date of said conveyance and agreement to the date of said further agreement by which said Chapman became a party in interest, and, from the date of said last agreement to the date of said agreement of March 10, 1852, the said Lownsdale, Coffin and Chapman, from time to time, sold numerous town lots to each other, and to various other parties, who settled upon and occupied the same, as town property, building up a town thereon, the said purchasers having no title other than such as derived from said Lownsdale, Coffin and Chapman, or some one or more of them. The population of the town of Portland in 1849 had become from 200 to 400 souls.

Said Davenport, after his said purchases, went into possession of said lots in controversy, claiming title under said conveyances, and said Davenport and his grantors made valuable improvements thereon, with the knowledge of said Lownsdale, and without any objection or suggestion of any want of title on his part. Said improvements were of the value of several thousand dollars. Said Davenport has ever since been in the possession of said lots down to the date of the filing of the bill of complaint in this action. Said Lownsdale, down to the date of his death, although aware of said occupancy, and the making of said improvements on said lots, and although his attention was called to the condition of the title by said Davenport, set up no claim to said lots adverse to said Davenport. Said Lownsdale, after said sale to said Marshall and said Fowler, as aforesaid, and before the patent issued to said Lownsdale, repurchased of said Fowler, for a valuable consideration, lots 3 and 4, in said block 13.

The decision of this action, I am satisfied, must turn upon the validity, construction and effect of the said various contracts and conveyances, copies of which are annexed to the cross-bill; and these must be construed in the light of the condition of things existing at the time, and with reference to which they were executed.

It is a matter of public history, of which the court can take notice, that Oregon was settled while the sovereignty of the country was still in dispute between the United States and Great Britain; that, subsequently, a provisional government was organized and put in operation by the people, without any authority of the sovereign powers; that laws were passed temporarily regulating and protecting land claims made upon public lands; and that, afterwards, a territorial government

was established under the authority of congress, and put in operation long before there was any law, or means by which the real title to any portion of land in Oregon could be obtained. The title to the lands in Oregon was vested in the United States, from the moment that the right of sovereignty was acquired, and the first law that was passed, by which the title in fee could in any way be acquired from the government, was the said act of September 27, 1850, called the "Donation Act." Long before that time, however, an organized community had existed; lands had been taken up and improved; towns laid out, established and built up, having a considerable population, and a growing commerce. It was necessary, in the nature of things, that some right of property should be recognized in lands, in the dealings of the people among themselves, and laws were adopted by the provisional government regulating the subject. Tracts of land were taken up and claimed by the locator within the limits, as to quantity, allowed; towns laid off, and lands and town lots sold and conveyed from one to another, in all respects, as though the parties owned the fee, except that every party dealing with the lands, necessarily, knew that he did not, and could not, under the existing laws, obtain the fee from the real proprietor. But it was, also, a matter of public history, of which everybody is presumed to be cognizant, that the condition of Oregon was, to a great extent, but the repetition of a condition of things that had existed in the first settlement of nearly all of the new states, and that, in those older new states, congress had, ultimately, made provision for recognizing the meritorious claims of the pioneers, who had settled up the country, planted the institutions of civilization, developed its resources, and thereby contributed to advance the interests of the nation; and had made provision by which their equities were protected, and the first right to purchase given to the first appropriator. It was believed that some similar provision would, also, in due time, be made in respect to lands in Oregon; and that those in possession would be preferred in the final acquisition of the title. That such expectations were entertained was, also, a matter of public history, and in view of such expected legislation towns were laid out, sold in lots, and occupied, and thus cities grew up on the public lands, without a shadow of title in the possessor, as against the United States, and without any existing law by which the title could be acquired. Marlin v. T'Vault, 1 Or. 78; Lownsdale v. City of Portland, Id. 390; Same Case [Case No. 8,578]; Sparrow v. Strong, 3 Wall. [70 U. S.] 104.

But between man and man, possession is evidence of title in fee, as against everybody but the true owner. The law protects, in his possession, the party who has once possessed himself of, and appropriated to his own use, a piece of unoccupied land, until he has lost his possession, and right of possession, by abandonment, as against everybody but the true owner, or one deriving title from the true owner. Such possession, and right of possession, are recognized as property by the common law, and the right is protected and enforced by the courts. A mere adverse possession, when the true owner is a private individual, may, by time, under the common law, and under the provisions of statutes of limitations, ripen into a perfect and indefeasible title. Arrington v. Liscom, 34 Cal. 381; Cannon v. Stockmon, 36 Cal. 540; Leffingwell v. Warren, 2 Black [67 U. S.] 605; 2 Bl. Comm. 196. Prior appropriation is the origin of all title. 2 Bl. Comm. c. 1. Prior discovery, and an actual or constructive appropriation, is the origin of titles, even in governments themselves. For communities situate like that in the early settlement of Oregon, no rule could be adopted that would better subserve the public interests, than to treat prior occupancy as giving a provisional title to lands, in reasonable quantities, and under proper restrictions, and, thereafter, until the real title can be obtained from the government, deal with it as between individuals, in all respects as if the prior occupancy originated and vested a title in fee. This is the natural order of things, and it affords a rule of conduct consonant with the ordinary course of dealings, and the common experience of mankind in organized communities. Starting with this idea accepted as a basis of a rule of property, we have a well known system of laws applicable to the case, adequate to all the exigencies of an organized society, while with any other principle, as a basis of action, we are at sea, and a system must be developed anew. It has generally been the practice, in the new territories, to act upon this idea, and the rights acquired in pursuance of such action, have been recognized and protected by the courts, and acquiesced in by the government. Among others, the cases of People v. Shearer, 30 Cal. 657; Moon v. Rollins, 36 Cal. 333; Bush v. Marshall, 6 How. [47 U. S.] 288; Thredgill v. Pintard, 12 How. [53 U. S.] 24, 37, 38; Sparrow v. Strong, 3 Wall. [70 U. S.] 104, and the cases therein cited, afford illustrations of such recognitions.

It was in view of such a condition of affairs existing in Oregon, as above indicated, that the Portland land claim was taken up, in accordance with the practice of the country at the time, regulated in many particulars by the legislation of the provisional governments, laid out into a town, and to a considerable extent sold out in lots, many of which were actually occupied by the purchasers for residences, business, and other purposes. The party taking possession of the land, and occupying it, acquired thereby a right of property in the possession, as against everybody but the United States—the true owner. This right could be transferred to another, by sale and conveyance, like any other right of property. Such a right has been recognized by the law, and the courts, in all the new states.

The California Reports, for instance, are full of cases recognizing and protecting such rights of property, and upholding their transmission from one to another by conveyance, devise and inheritance. Probably a majority of all actions brought in her courts for the recovery of lands, for many years, rested upon a mere possession, as the origin of the title relied on. It was in view of such a state of things, that the instruments in question were executed, and in their light the writings themselves, and the acts of the parties thereto, in connection with the subject matter, must be interpreted.

Recurring to the facts before set out, we find that, on March 30, 1849, Lownsdale was in possession of the Portland land claim of six hundred and forty acres in extent, except certain lots which had already been sold. He had all tue title that could, at that time, be acquired by a citizen under any law then existing. A portion of the claim had been laid out into town lots, some of which Lownsdale had sold. On that day, the two instruments, of which exhibits "A" and "B" are copies, were executed between Lownsdale and Coffin. These two instruments are, evidently, a part of one and the same transaction, and should be construed together, as though they were embraced in one instrument. Thus construed, they show that a partnership was contemplated between the two parties, to hold the said land claim, and sell it out in town lots, for the equal benefit of both. The legal title to this possession, under the contract, was vested in Coffin, but to be held in trust for the joint benefit of the two. They both covenant to make every exertion to acquire the true title from the United States, each to pay half the expenses of obtaining title, of improvements to be made, etc.; to sell lots and divide profits, until the partnership should be dissolved by mutual consent; and upon such dissolution Coffin was to convey one half to Lownsdale, according to the title they may then have. This constitutes a partnership between them, by all the tests by which that relation is usually determined. This is the relation, according to their own interpretation, put upon the instrument, when they executed the subsequent agreement by which Chapman is taken into the firm, and this is their legal relation, as clearly manifested by the instruments themselves.

It will be observed, that in conveying the legal title to the possession to Coffin, the lots before sold were excepted from the conveyance, showing that it was not contemplated that the parties to the contract should be regarded as having any beneficial interest in those lots which had "been sold to different persons, previously to this contract, as town property, to the different persons holding the same." Yet, when we come to the accompanying agreement, in which the object of the conveyance is set forth, the covenant is, to make "every exertion to obtain a title from the United States to six hundred and forty acres of land, where the town of Portland is situated;" that is to say, the whole tract, including the lots sold. There is no exception in this part of the agreement. In the agreement by which Chapman is admitted into the partnership, it is recited that Lownsdale and Coffin are joint owners of the town of Portland, and the claim upon which said town is situated, the said claim being recorded and held in the name of said Lownsdale. Then, after conveying an "undivided one third part of said claim, town lots and improvements," it provides, that, "The said Coffin, Lownsdale and Chapman are to be equal partners in the above described property, excepting town lots already sold previous to this date as town property." They, also, agree that "The parties shall take such steps for obtaining title from the government, as they may mutually agree upon." So again, in the further agreement of March 10, 1852, the same parties recite, that they "have heretofore, and up to the date of these presents, been joint proprietary claimants of the tract of land, etc., being the same tract which Lownsdale originally purchased of Francis W. Pettigrove, and upon which a part of the city of Portland is laid out;" that said Lownsdale, Coffin and Chapman "have sold lots in said city of Portland to each other, and to third persons, obliging themselves to make to the grantee, or grantees, a deed of general warranty whenever the grantor shall obtain a patent from the general government of the United States for the same," etc., and then enter into the several covenants before set out in this opinion, the fourth of which is: "That when a patent shall be so obtained, he will make good and sufficient deed of general warranty for all lots or parts of lots in the part or tract so patented to him, which may heretofore have been sold or agreed by the said parties jointly, or any of them separately, to be sold; that said deed, of course, in all cases to be made to the original grantee, his heirs, executors, administrators or assigns, grantee or grantees, as the case may be."

These instruments are all executed by the same parties, and relate to the same subject matter. They are in pari materia, and read in connection with each other, and in the light of the surrounding circumstances, it seems clear that it was the understanding of these parties, at all times, that they were to procure title from the government to the whole tract, as soon as it could be obtained, but that they were to have no interest, in their own right, in such lots as they, from time to time, sold in pursuance of the original plan of establishing a town. Whenever, in any of these writings, a new party is let in, all lots previously sold are excepted and reserved from the operation of the deeds conveying the interest to the new party, but when they come to the covenants to procure

title, the entire claim is evidently indicated, without such exceptions, or reservations. It was evidently contemplated that, as to the lots sold, title should be acquired, but for the benefit of the vendees, not of the vendors.

It is difficult to critically read these several instruments and reach any other conclusion. Accordingly, when they came to the last covenant in the final agreement, express provision was made for carrying out this intention and understanding. If the intent was not clearly expressed before, it is distinctly brought out now. Each party covenants in clear and express terms, that, "When a patent shall be obtained, he will make a sufficient deed of general warranty for all lots and parts of lots, in the part of tract so patented to him, which may heretofore have been sold or agreed by said parties jointly, or any of them separately to be sold;" and that said deed is "to be made to the original grantee, his heirs, executors, administrators or assigns, grantee or grantees, as the case may be." The covenant is not limited to cases where the parties had bound themselves to make their grantees a title by general warranty, when the patent should be obtained, but it extends to every sale made, whether by the parties jointly, or "any of them separately," and without regard to the time when it was made, whether before, or after Coffin and Chapman respectively purchased.

It is true, that in the preamble reciting the inducements, in part, to the contract, it is only mentioned that the parties "have sold lots in said city of Portland to each other, and to third persons, obliging themselves to make to the grantee, or grantees, a deed of general warranty, whenever the grantor shall obtain a patent from the government;" but the intent must be gathered from the whole instrument, and, from such examination, I am satisfied that the covenant was intended to cover, as it clearly does in terms cover, the sales under which Davenport claims, whether the sale from Coffin to Marshall, which must, also, be regarded as the sale of Lownsdale, or the subsequent sales from Coffin to Fowler, Mills and Cheeny. All are clearly within the express terms of the covenant, for all of them were sales made by some one or more of the parties to that instrument. The preamble does not recite, or profess to recite, all the objects in other particulars covered by the subsequent covenants. Besides, this covenant to convey to prior grantees all lots that had been previously sold, was, manifestly, made for the benefit of the vendees of the said parties under the various sales that had been made, and not for the benefit of either of said parties personally, as vendors. There was no need of the covenant for self-protection against any sale or conveyance recited. At all events, there is nothing in the covenant, or even in the recital, to indicate a contrary purpose, or any purpose, with respect to those sales other than to act in good faith towards such vendees. There is nothing to indicate that the parties to the covenant sought thereby to obtain any further pecuniary benefit for themselves, or to relieve themselves from any pecuniary obligations or liabilities. The only obligations recited to have been assumed is, "obligating themselves to make to the grantee, or grantees, a deed of general warranty whenever the grantor shall obtain a patent from the government." Now this covenant, so recited, did not impose any obligation to obtain a patent, or to make the deed if the grantor, himself, did not obtain a patent. It imposed no obligations on either of them to make "deeds of general warranty," to lands before sold by him, which should happen to fall within the tract patented to either of the others. As, for instance, it would impose no obligation on Coffin to make such deed to his prior grantees of land, which should finally be patented to Lownsdale or Chapman, for such lands having never been patented to him, the grantor, are not within his covenant. Hence, there would be no occasion to secure such conveyances from Lownsdale or Chapman for lots patented to them, as a means of relieving Coffin from liability on such covenants. The conveyance from Lownsdale or Chapman, to Coffin's former vendees, of lots finally patented to them, therefore, could in no way benefit him under such covenants as that recited. As to the land patented to Lownsdale, or Chapman, such covenants in prior conveyances of Coffin would have nothing upon which to operate. This fourth covenant in the agreement of March 10, 1852, then, must necessarily have been for the benefit of the prior vendees of the respective parties, and not of the parties themselves, who could, with respect to such lots, in no event, derive any benefit under it. The object must, necessarily, have been to fulfill the understanding to be derived from the previous agreements, and more fully developed in the last, that the title should be acquired for the benefit of the vendees of the claimants, so far as lots had been previously sold: or if not, at least, to give the impression to such vendees that they would obtain conveyances from the patentees, and so disarm opposition to their efforts to procure patents. No other reasonable conclusion is suggested by the language of the covenant, or by the circumstances, in view of which the agreement was made. The former is the honest and most reasonable construction, and is, therefore, to be adopted, rather than the latter, which would be fraudulent, and fraud is not to be presumed. It seems clear that the sales of the lots in question are not only, in fact, embraced within the terms of said fourth covenant, but, also, that it must have been so intended by the parties. The same equities existed in favor of these sales as of any others, and there was no greater occasion for the cove-

nant as a protection to the prior grantors against liabilities with respect to the latter, than with respect to the former, and no apparent reason for making any distinction between these different classes of sales. They had sold, and received the full consideration in both cases.

It having been determined that the fourth covenant is for the benefit of the prior vendees, or grantees, of the parties, either jointly or of any of them separately, and not of the parties themselves, merely, and that the lots in question are within the said fourth covenant, the next question is, whether the beneficiaries, under the covenant, can enforce the contemplated trust in their own names, in a court of equity? The question is not, whether a covenant to create a trust in favor of a third party, who is a mere volunteer, while it still remains in covenant, can be enforced by a decree for a specific performance, as has been argued. Had the complainant in the cross-bill sought to compel Lownsdale to acquire the title to the land from the United States, in order that the trust might vest, the question would have been different. But this is not the case. Lownsdale voluntarily performed that part of the covenant to acquire the title. That covenant became executed. The title was acquired by him in pursuance of the covenant, and the trust vested with the title so acquired. It no longer rested in covenant. The title was acquired in pursuance of the covenant, and, therefore, for the benefit of the parties designated by the covenant. This distinction is clearly stated in the leading case of Ellison v. Ellison, 1 White & T. Lead. Cas. Eq. 245, and cases cited in the notes.

Besides, the vendees of these parties are not, in my judgment, mere volunteers, without consideration, or meritorious claims, within the rule, as laid down in all that class of cases where it is held that the beneficiary cannot enforce the trust, while it rests in covenant, when not a party to the agreement. It will not be denied that, as to the parties themselves, Lownsdale, Coffin and Chapman, there was a meritorious and valuable consideration passed between them in their mutual covenants. Upon that point there can be no question. I also think that there was a meritorious consideration sufficient to support a trust, as between them and their prior vendees, in the relation in which they stood to them with respect to the lots sold. They had sold all they could possibly sell at the time, and only failed to grant more, because they had no more, and were unable to obtain any more to grant, and they received the full consideration. They dealt in view of the surrounding difficulties, arising from an inability to procure the title. They sold to their vendees their possession and present right of possession, which was an absolute right of possession, as against all the world

except the true owner, or some one standing in privity with the true owner. It cannot be presumed that this was done with a view, at the time, of afterwards acquiring the true title for themselves from under their vendees, for this would be to presume bad faith. One of the objects of the purchase, must, necessarily, have been, to be in a position to be entitled to the favorable consideration of the government, when it should consent to part with the title. Prior appropriation and possession had been the basis of all prior pre-emption laws, and from the nature of the case, it must have been supposed, at the time, that the possession would be the basis upon which the title to occupied lands in Oregon would be acquired, when congress should come to act upon the subject; and such eventually proved to be the result. In this case, the very possession which had been thus sold and conveyed, and for which a full consideration had been received, Lownsdale, necessarily, availed himself of, as a part of his general possession of the whole claim, to procure the title to these lots under the act of congress; for, by the very terms of the act under which he derived title, he could only obtain a patent after four years' residence and cultivation, and the possession upon which he did obtain his patent dates from September 22, 1848, long before the sale to Marshall. The consideration upon which the grant was made by the government to Lownsdale was his occupancy and improvement of the land; and that possession, and right of possession, of the land, as to these lots, had been sold to Marshall. If the possession which had been acquired by Lownsdale, afforded a meritorious consideration, as between Lownsdale and the government, even after he had sold it, the right to that possession, purchased of Lownsdale and Coffin, and paid for by their vendees, and which was held by them at the date of the said agreement and patent, ought, also, to afford a meritorious consideration as between Lownsdale, Coffin and Chapman, and their said grantees. As to these particular lots, then, the very possession, which had been sold to Marshall, and the right to which was in his vendees, at the time of the execution of this agreement, and of Lownsdale's filing his notification of claim with the surveyor-general, Lownsdale used as if still in himself, as a part of his general claim to acquire the title from the government. For that very possession, as to those lots, so used by him, a valuable and full consideration had been received by Coffin and Lownsdale in the sale to Marshall, and it was then the property of Lownsdale, Coffin and Marshall's vendees.

When, therefore, these parties covenanted among themselves in pursuance of their general plan, as indicated by the covenants and provisions of their said several agreements, to each present a claim for a patent to a specific portion of the whole claim, embra-

cing the lots sold, as well as those unsold, and use the possession which they had so sold, to acquire the title from the government, and then to convey the title, so acquired to the parts sold, to their respective prior vendees, they did so, not only upon a valuable consideration passing between themselves, but also upon a consideration of a meritorious and valuable character, which had already been received from such prior vendees, as to the lands covenanted to be conveyed to them, when the title should be received. The right of possession, at the time, was the property of the vendees, and that possession was, in part, at least, the very consideration upon which the government made the grant to Lownsdale. If it afforded a sufficient consideration to support a grant between the government and Lownsdale, it ought to be sufficient to support a trust between Lownsdale and his prior grantees of the possession, who then owned it. This, in my judgment, is a consideration which, when acted upon and made the basis of an express covenant, as in this instance, a court of equity ought to recognize, and will recognize; and it is sufficient to take these beneficiaries out of the category of mere volunteers, without any meritorious claim, as the terms are used in equity jurisprudence. Any other view would work a fraud, both upon the government and the vendees of the parties to these covenants, who might reasonably rely upon them, with the expectation that they would be carried out in good faith, and thereby be prevented from contesting before the surveyor-general, where the contest was to be made, the right of the covenantors to the land, and induced to forbear making an effort in some form to procure title in their own names. It seems probable that the various and numerous purchasers from these parties would suppose that such title would be acquired in good faith, in trust for the prior purchasers, under the covenants of the agreement in question. Equities of a character analogous to these, have been recognized by the supreme court of the United States, in the cases before cited, and in others. The case, I think, is within the class where the beneficiaries may enforce the trust, in a court of equity, in their own names. Even at law. in the case of a simple contract. a party for whose benefit a promise is made. though not a party to the contract, can maintain an action upon the promise, in his own name. Morgan v. Overman Silver Min. Co., 37 Cal. 534, and cases therein cited; Turk v. Ridge, 41 N. Y. 201. So, also, upon a covenant in a deed poll to pay money generally to a particular party mentioned, though not the party making the contract, such party could maintain an action in his own name. But in a deed inter partes, the beneficiary could not maintain an action at law in his own name, unless a party to the instrument. 1 Chit. Pl. 4, 5, and notes. But this distinction between simple contracts and deeds poll, and deeds inter partes, rests upon purely technical principles, which have no application in courts of equity.

In Racouillat v. Sansevain, 32 Cal. 377, and Racouillat v. Renè, an appeal in same case, by another party (Id. 450), the action was to foreclose a mortgage in the name of parties not parties to, or mentioned in the mortgage, otherwise than generally, under the designation of all prior "legal mortgagees and incumbrancers," for whose benefit, in part, the mortgage was given to another.

The question was made as to the complainant's right to maintain the action, but not much relied on, and the action was sustained, without comment by the court. In this case, the patentee, Lownsdale, gets the full benefit of his patent to all the lands embraced in it, for, in lieu of the lots before sold, he received and enjoyed their full value in the purchase money paid by his vendees.

Lord Chancellor Cottenham has well said: "It is the duty of courts of equity to adapt their practice and course of proceedings as far as possible to the existing state of society, and to apply its jurisdiction to all those new cases which must continually arise, and not from too strict an adherence to forms and rules established under very different circumstances, decline to administer justice, and to enforce rights, for which there is no other remedy." Taylor v. Salmon, 4 Mylne & C. 141; Wallworth v. Holt, Id. 635. If there is any doubt as to the right of complainant to enforce the trust, in the absence of any precedent involving precisely the same state of facts, the principle, thus forcibly stated, should resolve the doubt in his favor.

It is further urged, that it is a rule of the common law, that no covenant to stand seized can pass a use, unless the covenantor has a seizin of the estate, at the time of entering into the contract, and, therefore, that no valid trust could arise out of the agreement in question, for the reason that, at its date, Lownsdale was not seized of the fee. If the rule was ever applicable to analogous cases, I find it has been modified by modern decisions, which, under the view I take, it will not be necessary to notice now. The rule itself was a technical one, and adopted to suit a condition of things entirely different from that which gave birth to this transaction. The case now under consideration is, in many particulars, sui generis and technical rules resting upon reasons that have no application to the circumstances of this case, ought not to be too rigorously applied. Besides, under the donation law, Lownsdale was seized of an estate in fee, if entitled to a patent at all, from, at least, the date of the passage of the act, if not by relation from the date of his settlement. The terms of the act are terms of present grant. The grant was liable to be defeated by a failure to perform the conditions subsequent. but it was, nevertheless, a grant in praesenti.

Chapman v. School Dist. No. 1 [Case No. 2,607]; Doll v. Meador, 16 Cal. 295, and cases cited.

It is next insisted that the agreement of March 10, 1852, is void, under the fourth section of the donation act, and consequently that no trust can arise by virtue of the covenants therein contained. The language of said section is as follows: "Provided further, that all future contracts, by any person or persons entitled to the benefit of this act, for the sale of the land to which he or they may be entitled under this act, before he or they have received a patent therefor, shall be void."

Is this a "future contract" "for the sale of the land," within the meaning of this provision? If not, then, it does not fall within the inhibitions of the act, and it cannot be void on that ground. Only such contracts as are declared void are avoided by the act. On the contrary, all contracts in relation to the subject matter of the act, not embraced in its language. are by implication, at least, recognized as valid. Congress recognized the existing condition of things. It must be presumed to have been cognizant of the fact that land had been occupied by settlers; that towns had been laid out and lots sold; that contracts had been made in numerous instances with reference to such lands; that parties were in possession under such contracts, and that there were many existing obligations and equities connected with the subject; and it legislated in view of the existing state of affairs, and only sought to lay down a rule for the future, carefully avoiding any interference with, or disturbance of, contracts, or rights, as they then stood. The twelfth section, also. distinctly carries out the same policy, by discountenancing contracts affecting lands thereafter to be settled upon, before the issuing of the patent, and by strong implication recognizing existing contracts, interests and equities. It requires that those who shall make settlements after a certain designated date—giving sufficient time for knowledge of the provisions of the act to be brought home to the distant people of Oregon—to make affidavit that the land claimed "is for their own use and cultivation; that they are not acting directly or indirectly as the agents for, or in the employment of others in making such claims, and that they have made no sale, or transfer, or any arrangement, or agreement, for any sale, transfer, or alienation of the same, or by which the said land shall enure to the benefit of any other person."

No such requirement is made of those who had already made settlements. It was known that many of them could not make the affidavit; and the fact that express and minute provisions of the kind were carefully made for future contracts and settlements. without any such provisions respecting the past, is a recognition by strong implication of the right of the parties standing in a similar position in respect to past, and then existing transactions, to go on and complete their titles for the benefit of themselves, and those interested, according to their rights and equities, as they then stood. It seems evident that it must have been contemplated that, in many instances, the title upon possessions already commenced would, ultimately, be perfected for the benefit.of others than those to whom the patent would, in fact, issue. It was but just that it should be so, in view of the condition of things existing at the time of the passage of the act; and the act seems to have been carefully framed upon this theory, recognizing by implication all past contracts and existing interests, but prohibiting future sales and future settlements and donations for the benefit of any party but the actual occupant. The vendees of Lownsdale, Coffin and Chapman, with respect to the present donation made by the act, were as clearly within the equities, which dictated the policy, and therefore, within the policy, even if it be conceded that they are not within the express terms of the donation law, as they were themselves. The vendees of portions of lands taken up by larger claimants, and occupying their purchases under them, were as meritorious claimants on the bounty of the government, as were their vendors. There was no less cogent reason for recognizing the equities of such vendees of larger claimants, either in their own right, or through their vendors, than there was for recognizing the equities of the larger claimants themselves. It would, therefore, have been contrary to the general and beneficent policy of the very act itself, to have avoided existing contracts and equities.

The agreement of March 10, 1852, was, it is true. entered into after the passage of the donation act, but it is not, I think, a new or "future contract" for "the sale of the land." It is but the arrangement for carrying out the prior contracts of the parties to their completion, and in strict accordance with the terms of such prior contracts, adopting such changes in their relations, only, as were required by the exigencies of the donation act. By the contract of March 30, 1849, Lownsdale and Coffin became equally interested as owners of the unsold portion of the Portland land claim, and they then mutually covenanted to make every exertion to acquire the title from the United States to the whole six hundred and forty acres. By the agreement of December 13, 1849, Chapman was taken in as an equal partner, and they again mutually covenanted that "the parties shall take such steps for obtaining title from the government as they may mutually agree upon." No law had yet been passed by which the title could be acquired. and this, in the existing state of things, is all they could provide for at the time. The specific mode could not be

indicated, for it was not known what the exigencies of a law yet to be passed might require; and they could only make the general covenant, leaving the details open for future arrangement according to the occasion as it should arise. The act of congress was finally passed, by which it became necessary for claimants to present their claims singly, or severally, and thereupon, in pursuance of their prior contracts, the said parties proceeded to "mutually agree" upon the "steps for obtaining title from the government," and these are embodied in the agreement of March 10, 1852. They make no new sales or purchases, but simply provide for severing their interests, which were then joint, in the unsold portion of the claim, so that each could apply for a patent for a specific portion in his own name, and further provide that each shall continue his efforts to procure title, as they had before agreed, and when procured, convey to the others according to their respective present claims to the lots before sold to, and held by, each other; and, also, to convey to their various joint and several prior grantees, the lots already sold to, and paid for by, other parties. There was no new pecuniary consideration to be received, or new pecuniary benefit to be derived, from the arrangement. Its design was simply to provide for carrying out to the contemplated result their former contracts. And as far as this agreement provides for making conveyances to the proper parties, of all lots sold by them jointly, or any of them separately, I have no doubt that it but carried out the intention of the said several previous contracts, as the parties thereto themselves understood and interpreted them. This instrument, then, is but the mutual agreement provided for before, for procuring title for the benefit of the several parties according to their supposed equitable interests, as they existed at the time. The arrangement was a convenient mode of securing title in accordance with the exigencies of the case, to themselves, and to each of their prior vendees, who had, in fact, already paid to them a much larger consideration for the mere possession than was ever demanded by the United States for the true title to an equal amount of public lands. Settlers were compelled from the circumstances of the case to purchase just such titles, and trust to the developments of time, and the acts of the proper authorities, to secure titles, or withdraw from all participation in the settlement and building up of towns. The very fact of the purchase of such rights of property as existed, and the occupancy of the lots purchased, and building up of a town thereby largely enhanced the value of that portion of the Portland land claim which remained unsold, and which was finally patented for the benefit of the general proprietors themselves; and good faith, common honesty and common justice required that these prior sales should be recognized in this final arrangement for carrying out the covenants of the prior contracts. It is not surprising, that a covenant for the benefit of all prior vendees of the respective parties was inserted in the agreement. Indeed it would have been a matter of just surprise if such a covenant had not been inserted. All prior vendees of the parties, under the circumstances of the case were meritorious claimants, and not mere objects of a gratuitous bounty, and they were justly provided for, as such.

This instrument, then, is not a "future contract" "for the sale of the land," within the meaning of the act, but only the further agreement prescribing the details of the proceedings for securing the title for the benefit of themselves, and of the other parties, who had already purchased and paid the full consideration, in pursuance of the covenants in the former agreements, as they themselves understood and interpreted them; and although there may have been no legal obligation resting upon the parties to insert this particular covenant, or to procure the title for their prior vendees, who should fall within lands patented to a party other than their vendor, yet it is clear that the agreement in this particular recognizes a meritorious claim, and is in strict accordance with good morals, and the natural equities of the case. The parties to the contract, when the title had been obtained, were themselves but donees of the government. They paid no consideration to the government, other than that of mere settlement and improvement, and the contribution thereby made to the development of the interests and material prosperity of the country. Their vendees generally, so far as they occupied and improved the lots purchased, did as much, at least, for the interest of the country, and, in addition, paid a full consideration in money to the parties themselves. They were claimants equally meritorious with their grantors, and were, at least, equally within the policy, if not, also, within the express terms of the donation act. The parties to this contract, therefore, were not prohibited from recognizing and giving effect to past contracts, conveyances and transactions respecting the land, according to their respective merits, and none other were provided for in this agreement. I am satisfied that it is not a future contract "for the sale of the land," within the meaning of the act.

The act should, if necessary, be liberally construed, so as to give effect to the general policy implied from and indicated by its terms of recognizing the meritorious claims of all those who had before been compelled, from the necessities of the case, to occupy and improve their possessions, at the risk of finally losing the results of their labors and expenditures. The various vendees of the parties to this instrument are, I think, meritorious claimants within the policy of the

law, and not merely gratuitous beneficiaries. The agreement, in my opinion, is valid, and it was by virtue and in consequence of this agreement that Lownsdale himself was enabled to procure the title. Without it, and without the assent of his co-parties, he was not in a position to present and prove up his claim to any part of the land, and, having enjoyed the full benefit of the agreement, he ought to be held to a performance of all the obligations assumed by him under its provisions.

My conclusion is, that the matters set up in the cross-bill, and established by the evidence, are sufficient to call for the equitable interposition of this court, and to entitle the complainant therein to the equitable relief prayed for.

Let a decree be entered in pursuance of the prayer of the cross-bill, and denying the relief asked in the original bill.

DEADY, District Judge. I concur in the conclusion reached in the opinion of the circuit judge. After careful consideration, and not without some doubt and hesitation, I have become satisfied that by force of the agreement of March 10, 1852, and the subsequent action of Lownsdale, Coffin and Chapman, under and in pursuance of it, that each of them took and obtained from the United States his separate portion of the land claim in trust for the purchasers or their vendees of any lots situated therein, and before that time sold by any or all of these parties.

From the passage of the donation act—September 27, 1850—and prior thereto, Lownsdale, Coffin and Chapman had occupied and held this land claim in common and made sales of lots throughout the extent of it; but on March 10, 1852, by means of this agreement, and with intent to conform to the provisions of said act and obtain the benefit thereof, they partitioned the claim between them, so that each was thereafter enabled to proceed for himself and notify upon and obtain a donation of a separate parcel of the whole tract.

The donation act was a grant in praesenti. Each of these settlers—Lownsdale, Coffin and Chapman, was upon the land at the date of its passage, and from that time is deemed to have an estate in fee simple in his donation, subject only to be defeated by a failure on his part to perform the subsequent conditions of residence, cultivation and proof thereof.

This being so, it follows that at the date of this agreement either of these parties could impress a trust upon his donation in favor of any one. And even if it be considered that the settlers acquired no interest in the land until the partition and notification before the surveyor-general, still each one having acquired his separate portion of the common claim in pursuance and partly by means of this agreement, so soon as he did so acquire it, the trust provided for in it became

an executed one, and might be enforced by the beneficiary thereof, although a mere volunteer from whom no meritorious consideration moved.

But I do not think that these lot holders are shown or can be presumed in any way to have contributed to the acquisition of the land claim from the United States by the settlers. In the first place, I have serious doubts whether any one could acquire title under the donation act to a less quantity of the public land than the smallest legal subdivision—forty acres. It is confidently believed that no attempt was ever made to do so. The act was framed and passed to meet the condition and wants of an agricultural community already upon the land and in occupancy of it, and made no provision concerning town sites or lots as such. The only town in the territory then of sufficient importance to be known to congress, was Oregon City, and this site was reserved for the benefit of a university, subject to the right of the purchasers of lots from the former occupant of the claim, to have the same confirmed and patented to them direct. Donation Act, § 11. But admitting that one of these lots or blocks might have been claimed under the act as a donation, there is no evidence that any of the persons claiming the lots in question, in March, 1852, was personally residing upon and cultivating it, as required by the act, and from the general and well known history of the country at this period, it is safe to assume that none could be produced. To acquire a title under the donation act, required, as a consideration, a servitude of four years personal residence upon and cultivation of the land claimed. In March, 1852, the future value of lots in Portland was very problematical. The class of people who settle and build up new towns were on the wing. The rich gold mines lately discovered in the southern part of the state were attracting much attention and measurably depopulating Portland and the region round about. Indeed, it is doubtful if one person in ten of the lot holders of that day would have taken any lot or block in Portland as a gift, upon the conditions of continued and personal residence and cultivation required by the donation act.

Again, it is judicially known to the court that, prior to the passage of the donation act, the title to all the lands in Oregon was in the United States, that in March, 1852, no one could have had any title to any portion of this land except under that act. Lownsdale v. Parrish, 21 How. [62 U. S.] 290; Sparrow v. Strong, 3 Wall. [70 U. S.] 103. Therefore there can be no presumption that these lot holders had any interest in the lots except the bare possession, or were in any condition to claim them adversely or in opposition to the paramount occupation and title of the settlers. The lot holder occupied and claimed under and in subordination to the settler, and could only acquire title through him.

In the great majority of instances the settler was under written obligation of some kind to make title to the lot holder when he should acquire it.

From the view taken of the matter, I do not deem it material to consider whether the deed to Marshall is the deed of Lownsdale or Coffin. Upon this point I express no opinion. For whether it be the deed of either or both, the transaction was a sale of their interest in block 13 by one of the parties to the agreement of March 10, 1852, and therefore within the terms of the trust declared and provided for in the fourth covenant of that instrument.

Neither do I consider or decide the question whether Coffin became reinvested with the right of Marshall in or to block 13 by the redelivery to him of the Marshall deed in San Francisco. Upon the hearing counsel for the respondents in the cross-bill, expressly declared that they made no question as to the sufficiency of the mesne conveyances from Marshall to Davenport, and admitted, so far as they were concerned, that the latter might be considered as having acquired all the right that Marshall ever had in the premises.

I think the agreement of March 10, 1852, a valid instrument, and not within the prohibition contained in section 4 of the donation act against "all future contracts" "for the sale of the land" granted by the act. By its terms it appears to be a contract concerning the making of title to the parcels or lots of land already sold, and for aught that appears before the passage of the donation act. But if this were doubtful, good policy, it seems to me, requires that the instrument, as between the parties to it and in favor of those intended to be benefited by it, should be so construed and upheld.

[NOTE. The plaintiffs took an appeal in this case to the supreme court, which affirmed the decree of the circuit court. Mr. Justice Miller, who delivered the opinion, held that contracts made between actual settlers on the public land, concerning their mere possessing rights, were, as between the parties, valid and binding, and that this is true, though there was at the time no act of congress by which they might secure any title to the land. The provision of the Oregon donation act making void all future sales by settlers until patent issues, has no application to sales made before the passage of the act. In speaking of the use of the word "future" in the act, says the learned justice: "The act was, on its face, intended to cover settlements already made, and the careful limitation of this proviso to future contracts of sale; that is, sales made after the passage of the act,—raises a strong implication of the validity of such contracts made before the passage of the statute." 18 Wall. (85 U. S.) 307. For other suits by the same plaintiffs against other claimants of interest in the Portland land claim, see Cases Nos. 8,012, 8,017, 8,023, 8,024. For suits brought against these plaintiffs in the same matters, see Id. 4,769, 4,775, 4,776. For suits brought by the plaintiffs for their interest under Nancy Lownsdale, see Id. 8,013, 8,021, 8,022.]