LOWNDES (PHILLIPS v.). See Case No. 11,103.

LOWNSDALE (FIELD v.). See Case No. 4,769.

## Case No. 8,578.

### LOWNSDALE v. PORTLAND et al.

[1 Deady, 1;[1] 1 Or. 381.]

District Court. D. Oregon. Jan. 8, 1861.

REAL PROPERTY—SUIT TO QUIET TITLE — PRIVIES —VOID DECREE — OREGON TOWN SITE LAW — TITLE BY OCCUPANCY — DEDICATION TO PUBLIC USES—EXCEPTIONS FOR IMPERTINENCE.

1. A decree in a suit between P., a lot-holder in the town of Portland, and L., C. and C., settlers upon the Portland land claim, declaring a certain strip of land to have been dedicated to the public, cannot be pleaded as an estoppel in a suit by the grantee of L. against the town of Portland, concerning a portion of the same premises—the municipal corporation and P. are not privies.

[Cited in Coffin v. Portland, 27 Fed. 417.]

2. The decree pronounced by the supreme court of the late territory of Oregon, at the term of June, 1854, in the suit of Parrish v. Stephens, [1 Or. 61], is void, because neither party to the suit had any interest in the land in controversy by which the court could obtain jurisdiction to make the same.

3. The decree in the Parrish suit was not a decree in rem, but in personam, and the manner of pleading it cannot change its character in this respect.

4. The act of congress of August 14, 1848 (9 Stat. 323), organizing the territory of Oregon, did not extend the act of May 23, 1844 (5 Stat. 657), commonly called the "Town-Site Law," over the territory; but the first act of congress affecting the title or disposition of lands in Oregon was that of September 27, 1850 (9 Stat. 497), commonly called the "Donation Act."

[Approved in Chapman v. School Dist., Case No. 2,607. Cited in Stark v. Starr, 6 Wall.

[1] [Reported by Robert D. Benedict, Esq., and here reprinted by permission.]

[1] [Reported by Hon. Matthew P. Deady, District Judge, and here reprinted by permission.]

(73 U. S.) 415; Same Case. Case No. 13,307; Lamb v. Davenport, Id. 8,015. Cited in brief in Lamb v. Davenport, 18 Wall. (85 U. S.) 311. Cited in U. S. v. Tichenor, 12 Fed. 422.]

5. Under section 14, Act August 14, 1848 (9 Stat. 329), which provides that the laws of the United States should be in force in the territory of Oregon, "so far as the same, or any portion, may be applicable," the power is devolved upon the court, when the question arises, to determine what laws are "applicable" and what are not; and in determining this question, the court is not bound by any construction which the administrative department of the government may have given to such provision, in the discharge of its duties.

[Cited in Hall v. Austin, Case No. 5,925; Stark v. Starr, 6 Wall. (73 U. S.) 416; Barney v. Dolph, 97 U. S. 654.]

6. A settler on the public lands in Oregon—prior to September 27, 1850—held the mere possession thereof, under what was known as the "Land Law" of the "Provisional Government of Oregon;" the interest of such settler in the land ceased with his ocupation, and when he abandoned or transferred the possession to another, that other took it as though it had never been occupied; nor could the first settler, by any act of his, charge such lands, in the possession of the second one, with any easement or incumbrance whatever.

[Cited in Chapman v. School Dist., Case No. 2,608; Town v. De Haven, Id. 14,113; Barney v. Dolph, 97 U. S. 657; Bear v. Luse, Case No. 1,179; Dalles City v. Missionary Soc., 6 Fed. 370; Shively v. Welch, 20 Fed. 33.]

7. A dedication to public uses, by a release, upon condition that a pending suit concerning the premises shall be dismissed, does not take effect in case said suit is not dismissed.

8. A dedication to public uses by a release, without covenants, by a person who is a mere occupant of the public land, without other estate or interest therein than the bare possession, does not bind an after-acquired estate in the same premises.

[Cited in Lownsdale v. City of Portland, Case No. 8,579; Myers v. Reed, 17 Fed. 405.]

9. Where an answer to a bill in equity is excepted to for impertinence, if the matter excepted to be in response to the bill, the exception will not be allowed, though the matter be impertinent.

[This was a suit by J. P. O. Lownsdale against the city of Portland, George C. Robbins, Jacob Davidson, A. D. Shelby, Jacob Stitzel, William S. Higgins, J. C. Ainsworth, M. M. Lucas, E. D. Shattuck, Absalom B. Halleck, Orville Risley, and James H. Lappens to quiet title to certain lots in Portland. The case is now heard upon exceptions to amended answer to amended bill.]

George H. Williams and W. W. Page, for complainant.

George H. Cartter, for defendants.

DEADY, District Judge. This is a suit in equity to quiet title. The bill alleges that the complainant is a citizen of Indiana, and seized in fee of lots numbered 1, 2 and 3, in block 74, in the town of Portland, and has been so seized and occupied the same since January 1, 1853; and that about July 1, 1860, he commenced to improve said lots by the erection of wharves thereon, and that he continued to make said improvements without let or hindrance from the defendants until about the time of filing the bill herein—November 9, 1860—when the defendants threatened to destroy and remove the same, and did proceed to put said threats into execution, by arresting his agents and workmen while engaged in erecting said improvements; and that the defendants have no right, title, or interest in or to the premises, and that the proceedings of the defendants impair the value of the premises, and are to the irreparable injury of the complainant. Afterwards complainant filed an amended bill, upon which a provisional injunction was allowed until the further order of the court, enjoining the defendants as prayed for in the bill. To this amended bill the defendants filed an amended answer, to portions of which complainant filed eight exceptions for impertinence.

In considering these exceptions, this answer must be treated as a whole. Much of the matter to which the exceptions go might have been pleaded as pleas, but the defendants under the option given them by the equity rule 39, have pleaded them by way of answer. An answer in equity being necessarily a unit—a whole—the attempt to plead certain parts of it separately, by calling them "counts in equity," does not change its character in this respect. Indeed, such a thing as "a count" is not known to equity pleadings. The phrase belongs to the common law, and even then applies only to the pleadings of the plaintiff. Wherever, then, matters alleged in one of the "counts" in the answer, is contradicted by the allegations in another "count" or portion of the answer, for the purpose of these exceptions such allegation is considered as untrue. The answer denies the service, possession and occupation of the complainant, and then "for further plea and answer," by way of what is called in said answer a "count in equity," pleads a decree of the supreme court of the late territory of Oregon, pronounced at the term of June, 1854, of said court in a suit in equity, wherein J. L. Parrish was complainant and Daniel H. Lownsdale, Stephen Coffin and W. W. Chapman were defendants. The said "count" recites from the pleadings in said suit, that in 1850 said Parrish, having before that time purchased a block of lots fronting on Water street, in said town of Portland, filed a bill in chancery, praying an injunction against said defendants, because said defendants were about erecting buildings on the strip of land adjoining the Wallamet river, in front of said block, to the irreparable injury of said Parrish. That Pettigrove and Lovejoy, the former claimants of the town site, had, in laying out said town, dedicated said strip of land to public use as a levee. That the defendants L., C. and C., answered said bill, denying said dedication, and that upon the hearing, the court aforesaid, found and decreed, that the strip of

land was so dedicated, and that the same was a part of Water street, and perpetually enjoined the defendants from erecting obstructions on the same. The said "count" further alleges that the town of Portland had notice of said suit—that it was a party in interest, and employed one McCabe to appear for it in court; and that the complainant has no other title or interest in the premises than what he has derived from D. H. L., aforesaid, by conveyance long after the commencement of said suit; and that the premises in question are a part of said levee of Water street, declared by said decree to have been dedicated to public use, and that therefore the complainant is estopped to claim the contrary.

This "count" or portion of the answer is excepted to as impertinent, because it appears that the decree therein pleaded was pronounced between different parties; and if this were otherwise, because it appears such decree is void, the court that gave it not having jurisdiction of the subject matter, because, at the commencement of said suit, no law had been passed by congress whereby anybody could acquire any title to or interest in lands in Oregon. On the contrary, the defendants insist that the decree is a valid subsisting decree—that the present defendants are privies of Parrish, and that therefore the decree is a bar to the relief sought by the complainant. The rule of law claimed by defendants is admitted. When a court of competent jurisdiction has determined a controversy or question, the parties thereto, their privies in blood, law and estate, are bound by it, and estopped from asserting in any court the contrary. But the estoppel must be mutual and bind both parties—the party who relies upon it as well as the party against whom it is alleged. It is admitted, that as to the premises in controversy, the complainant is a privy in estate with D. H. L., but denied that the defendants are privies in estate with Parrish. If the parties are privies at all, they are privies in estate. In support of the proposition that the defendants were parties to the Parrish suit, effect is sought to be given to the allegation in this "count," that the defendants were parties in interest therein, and employed counsel to appear for them. If, by the phrase "party in interest," it is meant to assert that the town was a party to the Parrish suit in the usual and legal sense, by being a party on the record, then the allegation is shown to be untrue, because it appears from the answer itself that Parrish was the sole complainant on the record. But if the words are used in the sense that the town had an interest in the question involved in it, by reason of having a like claim to an easement in this or other property similarly situated, then they signify nothing, because to be interested in the question determined by a suit, in no way makes the town a party to it. If, in a suit between A and B, the question is, whether a conveyance of black acre by a deed not duly acknowledged passed the estate to the vender, and there should be a hundred other persons having conveyances to land in the same state, similarly executed, they would all have an interest in the question involved in the suit between A and B, because the law as determined in that case would be the rule for like cases, but still they are not parties to the suit, or in any way estopped by the determination of it.

As to the employment of counsel by the town, the record, as set up in the answer, shows that the counsel spoken of appeared for Parrish, and not for the town. I suppose the fact is that the town, after its incorporation, thinking, so to speak, that it had an interest in the question, or being so advised by counsel, contributed something to stimulate his efforts as the solicitor of Parrish. The case is the same as if the hundred persons in the instance supposed had contributed money to employ counsel to argue B's side of the controversy between him and A, for the purpose of procuring a determination thereof, which, as a precedent, would be favorable to themselves. This would not make them parties to the suit.

But there is a fact stated in the answer which makes it legally impossible that the town could have been a party to the Parrish suit; and that is—the town was not incorporated until 1851—after the commencement of such suit. A party to a suit must be either a natural person or persons or a legal entity, as a corporation created by or in pursuance of law. The town of Portland had no legal existence before its incorporation. How, then, could it be a party to a suit before that time? As well might an unborn child be called a party to a suit. At the commencement of the Parrish suit, there may have been people living in the place called Portland, and in the common parlance of speculators in lots, the "place" may have been called a "city;" but none of these persons except Parrish were parties to his suit, and the municipal corporation since created and styled "the city of Portland," which now represents the inhabitants of the place, as defendant to this suit, did not then exist. Neither is there any privity in estate between the defendants and Parrish. They do not claim through or under him. The suit of Parrish was brought upon the ground of a private right in him to have the levee left open so the public could have free access to his, Parrish's, premises; and that if the defendants, L., C. and C., were allowed to obstruct the levee in front of his premises, and thus prevent the public from reaching his place of business, it would depreciate the value of his property and thus do him a private injury. To my mind it is as plain as that two and two make four, that the town of Portland was not a party to the Parrish suit, nor in any way a privy in estate with him. The town would not be estopped by

this decree, and as estoppels must be mutual, neither can the complainant be.

As to the second point made by the complainant in support of this exception, I do not think that I can take judicial notice that the case of Lownsdale v. Parrish, 21 How. [62 U. S.] 290, is the same as the one pleaded in the answer. But, of course, the principle laid down in that case is applicable to like cases and of binding authority in this court. The supreme court, in that case, dismissed the appeal, because the subject of the controversy as to the parties to the suit had no value. Why had it no value? Because, in the language of the court, "neither party had any title or interest in the land whatever." They had no interest in the land because, says the same authority, "congress passed no law in anywise affecting title to lands in Oregon territory till September 27, 1850," and before that time this suit was commenced. Under this state of facts and law had the territorial court jurisdiction of the subject matter? To answer this question, it would seem to be enough to ask what was the subject matter of the suit? It was the alleged interest of the parties in this land; but as neither had any interest in it, there was nothing upon which the court had the power to adjudicate. From these premises it necessarily follows, that the decree of the territorial court in the Parrish suit is void, and neither binds nor affects anybody. The first exception must be allowed.

The second exception is taken to that part of the answer, pleaded as a second "count in equity." In it the Parrish suit and decree is again set up in bar of this suit, without the allegations relative to the town being a party in interest and having employed counsel.

It is difficult to understand the object of pleading the same decree twice in the same answer; but I believe the learned counsel for the defendant insists, that this decree, as pleaded in this so-called "count in equity," has become, in some occult way, an adjudication in rem, and binds all the world. If such is the effect of this decree by simply pleading it twice, it would be a curious question in legal alchemy what might be the result of pleading it twice. A judgment in rem is given in a proceeding in courts of admiralty and the court of exchequer; the suit is against the thing and therefore called in rem, as a ship claimed as prize or liable for seamen's wages or goods forfeited for being imported contrary to the revenue laws, and the judgment of the court is given directly against the thing, and determines the status, and all questions of ownership or property dependent thereon, from thenceforth. From the necessity of the case—for the convenience of commerce, to this judgment all the world are said to be parties. and therefore bound by it. During the pendency of the suit, any one may come into court, prefer a claim to the thing or an interest in it, and be heard and control the proceedings; and if any one having such a claim or interest omits to do so, he is properly deemed to acquiesce in what takes place. But in a criminal proceeding, at the suit of the king in the exchequer, against a person for an unlawful importation of goods, although the question of unlawful importation is passed upon, the judgment of the court is not in rem but in personam against the wrong-doer, and does not determine the ownership of the goods.

In no sense was this a decree in rem, it was pronounced in a suit in personam against the personal defendants, L., C. and C. This "count" is nothing but the first "count" repeated with the omissions mentioned. The exception to it is allowed. The third exception includes so much of the answer as is called therein the fourth "count in equity." Substantially it alleges, that in 1845, a number of persons occupied the present site of Portland, and laid out a town thereon for the purposes of trade and commerce; and that said persons and others, the inhabitants of Portland, have always used said levee as a public easement, except certain portions of the same wrongfully occupied by private persons. That the territory of Oregon was organized by act of congress of August 14, 1848, by virtue of which act, the act of congress of May 23, 1844, commonly called the "Town-Site Law," was extended over Oregon. That on January 23, 1851, the town of Portland was incorporated, and that in 1852, the United States surveys were extended over the place. That in 1858 the town of Portland, entered at the proper land office, the present site of Portland, under the town site law of 1844; and that in 1860, the town received a patent therefor from the United States for the purposes provided in the act of 1844. That complainant derives title to the premises from D. H. L., and that the title of the latter is founded upon his entry of March 11, 1852, under the donation act of September 27, 1850; but that said land was not subject to be taken as a donation under the act of 1850. That said D. H. L. acquired no title by said entry, but that said land was vested in the occupants thereof under the act of 1844, and that the premises in controversy are within said entry by the town.

Counsel for the complainant insists that the matters above stated are no bar to the relief sought, because the act of 1844 was not in force in Oregon at the time of the donation entry of D. H. L., and if it was in force, the town is seized only as trustee "for the benefit of the occupants thereof according to their respective interests," and that the complainant is the occupant of the lots in question. and that his interest under the town site law includes the estate in said lots, except the naked legal title held by the city as trustee for his benefit. For the defendant it is contended that by the provision of the act of August 14, 1848, which "declared the laws of the United States ex-

tended over" and "in force in said territory, so far as the same or any provision thereof, may be applicable," that the act of 1844 was extended to Oregon, and the decision of the general land office and the issuance of this patent, are relied on as authority for such construction of the act of 1848. That an occupant, under the town site act of 1844, in his right of selection as to the particular place he will occupy, is subordinate to, and must be governed by the law of the community constituted of the occupants of the town; and that such portions of the town site as this community may designate as streets or public grounds, for that reason become so, and are not open or subject to individual appropriation and occupation.

The limit of individual right of occupation under the town site act is difficult to determine. The difficulty lies principally in the meagreness and inadequacy of the act to the regulation of the subject. When a number of persons, coming together fortuitously, settle down upon a tract of public land and gradually build up a town, it is difficult to find any authority in the act of 1844 by which any number of said occupants can constrain any less number to occupy more or less of said land, or in this or that place. I suppose the act was originally passed as a special and temporary measure, to meet the case of some town already built up on the public lands, and it adopted the state of things as to the division into streets and lots then existing there. But it is not necessary to pass upon this question, because the answer denies the seizin and occupation of the complainant, and for the purposes of this exception that denial must be taken as true. Assuming, then, that the complainant is not an occupant of the premises, if the town site act was in force in Oregon, by virtue of the provision of the act of August 14, 1848, then the complainant would be without right or interest in the premises, and therefore not entitled to the relief sought.

This leads to the consideration of the question whether the town site act was in force in Oregon prior to the time it was specially extended here by act of July 17, 1854. Its operation since that time could not, I conceive, affect the rights of the parties to this suit, because it appears that D. H. L. entered the land in question under the donation act of 1850, as early as March 11, 1852. The question must, therefore, be determined in accordance with the law in force at and before the time of that entry. When congress, in organizing the territory of Oregon, by the act of 1848, declared that the laws of the United States should be in force in said territory, "so far as the same, or any provision thereof may be applicable," it did not mean that any particular one of such laws should be in force here, but only such as should be determined "to be applicable." Under this state of things, so far as the rights of person and property are concerned, authority is nec-

essarily given to the courts, and it becomes their duty, whenever the question comes before them, to decide what laws were applicable and what not; and, consequently, what were in force and what not. Doubtless the administrative department of the government—the general land office, for instance—charged with the authority and duty of disposing of the public lands in this territory, may be called upon to decide the same question. But I respectfully submit that such decision does not conclude the courts in a proper case, where the parties are before the court claiming under conflicting or any laws of the United States, from deciding what laws were applicable to the territory at a particular time, and consequently in force, and what were not, independently of said decision, or even adversely to it. It is well known that at the time of the organization of the territory of Oregon, by the act of 1848, an anomalous state of things existed here. The country was extensively settled, and the people were living under an independent provisional government established by themselves. They were an autonomous community, in the full sense of the term, engaged in agriculture, trade, commerce, and the mechanical arts; they had built towns, opened and improved farms, established churches and schools, laid out highways, passed revenue laws, levied and collected taxes, made war and concluded peace by their own authority. From the necessity of their condition, and as the corner-stone of their government and social fabric, they had established a "Land Law," regulating the possession and occupation of the soil among themselves. That all this was known to congress, at the time of the organization of the territory, would be highly probable from its historic importance, and is certain to have been so from the language of sections 14 and 17 of the act of 1848.

The leading feature of the land law of the provisional government, was that which provided that every male inhabitant of the country, over a certain age, might occupy and possess 640 acres of land. The uses that the land might be put to by the occupant were immaterial. He might cultivate or pasture it, or if he possessed a good site, and had the necessary thrift and enterprise, he might lay off and build up a town upon it. In the disposition of the public lands by congress, this state of things called for peculiar legislation, differing altogether from that required for an unsettled country. Under these circumstances, can it be presumed that the town site act of 1844—an obscure, special, and insignificant provision of the then existing land system of the United States—was extended over this country, while the general system contained in the pre-emption act of 1841 was left behind? Nothing can be more unreasonable. It would tax the ingenuity of man to find a provision in the land system of the United States, as it stood in 1848, less applicable to

the condition of Oregon, or that would have worked greater hardship, confusion and injustice than the act of 1844. To the thrifty and enterprising settler it would have said: By your management and industry you have built up a town on your land claimed and thereby lost it. If you had been content to live upon it in a seven-by-nine cabin with tottering lean-to attached, and merely pastured it with a few Spanish cattle and cayuse ponies, it would have been yours. The acts organizing the territories of New Mexico, Kansas and Nebraska, extended the laws of the United States over them in the same language that the act of 1848 did over Oregon, and yet they were not deemed to have extended the act of 1844 over these territories. But congress, by special enactment of July 22, 1854, extended it over them. If their organic acts extended the act of 1844 over them, why this special legislation for that purpose? By act of September 9, 1850, California was admitted into the Union. Section 3 of the act declares "that all the laws of the United States not locally inapplicable, shall have the same force and effect within the state of California, as elsewhere in the United States." This provision was never supposed to have extended the act of 1844 or any portion of the land system of the United States, over that state; but on the contrary, congress, by special act of March 3, 1853, provided for the disposition of the unclaimed lands within that state, and extended the act of 1844, by name over the lands therein, not mineral, and "occupied by towns and villages." But I conceive that this question has been negatively determined by the supreme court in Lownsdale v. Parrish, supra. In that case the court says, that on July 29, 1850, when that suit was commenced, "congress had passed no law in anywise affecting the title to lands in Oregon," nor did not "till September 27, 1850," referring to the passage of the donation act. The general expression includes the particular; and in this case the court must have specially considered whether the particular act of 1844 was in force or not, for the parties litigant before them were occupants of lots in the town of Portland, claiming some kind of an interest in or right to them. Yet the court say, that no law had been passed by congress in anywise affecting the title to lands in Oregon, before September 27, 1850; thus by the plainest implication negativing the proposition that the act of 1844 was extended to Oregon by the act of 1848.

But the passage of the donation act itself is further evidence that congress did not deem the act of 1844 "applicable" to Oregon, and did not intend to extend it here. This act is a wide departure from the act of 1841, commonly called the "Pre-emption Act." It is a system complete in itself, and was admirably adapted to the condition of the people and the country as it found them. Substantially, it gave to every settler in the country his land claim as he held it, without any reservations or conditions as to lands fitted for the purposes of trade and commerce or town sites whatever. It assumes to be, as it really was, the first legislation by congress affecting the public lands in Oregon. It was a practical and just recognition of the land law of the provisional government. The donation act is in this respect incompatible with the act of 1844, and its passage puts the matter beyond cavil or doubt, that the act of 1844 was not in force here, until specially extended as above stated. In Marlin v. T'Vault, 1 Or. 77, this question is well considered and the conclusion reached that the act of 1844 was not extended to this country by the act of 1848. This exception must be allowed.

The fourth exception is taken to a portion of the answer called the fifth "count in equity." Said "count" alleges that in 1845 Pettigrove and Lovejoy selected the present site of Portland and caused a town to be laid out thereon; and that said P. and L. dedicated said levee to public use as far as was in their power. That the people of Portland accepted said dedication, and occupied said levee without let or hindrance up to the year 1849, when said P. and L. sold their claim to said town site to D. H. L. aforesaid; and that the said D. H. L. recognized said dedication, but when or how is not stated. That the people of Portland have always enjoyed the free use of said levee, except where private individuals have wrongfully occupied the same; and that D. H. L. did dedicate said levee to public use, and has never paid any taxes on the same. That D. H. L. claims to have acquired title to the premises since said dedication; and that complainant derived his title from D. H. L. long after said dedication. The exception goes to so much of this so-called "count" as concerns the acts and doings of P. and L., and extends to the figures "1849." It must be allowed. The question is too plain for argument. P. and L. had no interest in the soil, never acquired any, and had nothing to dedicate. They simply held the naked possession of the land under the laws of the provisional government, according to the custom of the country, and when they gave up and abandoned this possession to D. H. L. he took it as though the foot of man had never been upon it, except as to the extent of its boundaries, or any liability he might take upon himself by special agreement with said P. and L. in relation to their past acts concerning it.

The remainder of this so-called "count" is also excepted to. It alleges a dedication upon the part of D. H. L., directly, and also by recognizing the one said to have been made by P. and L. Now if D. H. L. made a dedication of the premises to public use, or recognized and confirmed one made by others, it is binding upon him, and also upon the complainant, his grantee, by reason of the priority of estate between them. What

amounts to a dedication, and what does not, and whether any dedication made by D. H. L., before the passage of the donation act, will bind the after acquired estate, are questions that will properly arise and be determined on the final hearing. This exception is disallowed.

The sixth exception is taken to so much of the answer as is denominated the sixth count in equity. This "count" alleges that on August 14, 1850, L., C. and C. aforesaid, released to the public certain lots in said levee, including the one in controversy; that the release was made upon certain conditions, one of which was, that the suit of Lownsdale v. Parrish, aforesaid, should be dismissed; and that the conditions upon which said release was made have been fulfilled, and the release accepted by the people. That the town has power by its charter, to remove obstructions from the levee, and that complainant derived his title from D. H. L. long after the making and acceptance of said release. In support of this exception it is urged by the complainant that said release appears to have been made before the passage of the donation act—September 27, 1850—when D. H. L., nor any other, had no estate or interest in the land, and that being without covenants, it does not bind an after acquired estate in the premises; and that, if this were otherwise, the release never took effect, because the answer shows that the condition upon which it was given was never fulfilled—namely, the dismissal of the Parrish suit. Upon examination of the authorities, I find the cases upon the point, without exception, concurring in the rule, that a conveyance by deed of bargain and sale or release without covenant, does not bind an after acquired estate in the same land which as to the grantor, was then contingent. Where such after acquired estate is obtained by the grantor from any other source than the title which he assumes to bargain, sell or release, he is not estopped from claiming the premises, even against his own grantee. This release was made when D. H. L., had no interest in the soil. It passed nothing, supposing that it took effect, beyond the mere naked possession which he held under the laws of the provisional government. If he afterwards acquired the title to the premises from the United States under the donation act, it did not inure to the benefit of the public on account of said release. It may be, that where a party has the equitable estate or interest in lands and conveys the same by deed of bargain and sale or quit claim and release, without warranty, and afterwards acquires the legal estate, that while he is not estopped by such deed from asserting said legal estate, equity will compel him to convey it to his grantee of the equitable estate.

Where there is a dedication to public uses, under similar circumstances, without deed, but by acts and declarations of the party having the equitable estate, the rule seems to be that the after acquired legal estate attaches to the dedication as soon as acquired by operation of law. But there can be no question upon authority that this release does not estop or bar the complainant from asserting his legal title to the premises, and upon the showing of the answer, it would be against equity and good conscience that it should. For while it is true that this portion of the answer avers that the conditions upon which the release was made were fulfilled, elsewhere the answer shows that this averment is not true. At the time the release was executed, it appears that the Parrish suit was pending. It involved the right of Parrish and the public to an easement in the strip of land since called the levee as against the alleged exclusive right of possession of L., C. and C. The terms of a compromise were agreed upon, by which the defendants in that suit were to release a portion of the levee to the public—the latter at the same time relinquishing all claim to the remainder and to procure the dismissal of the pending suit. Yet it appears that the suit was not dismissed, but prosecuted to final decree in the territorial court against the defendants, which decree is now set up in the answer herein as an estoppel. Under the circumstances, to allow the defendants to claim anything under this release, would be in effect to sanction a fraud upon the releasors. This exception must be allowed. The complainant has taken an exception to the separate answer of the recorder, Orville Risley, and also to the like answer of the marshal, James H. Lappeus. Neither of these exceptions is well taken. The matter excepted to may be impertinent, but being in response to his amended bill, the complainant cannot object to it on that ground. Decree, that the first, second, third, fourth and sixth exceptions be allowed and that the remainder be disallowed.

[The case was subsequently heard upon bill, answer, and proofs, upon which a decree for complainant was entered. Case No. 8,579.]