DALLES CITY *v.* THE MISSIONARY SOCIETY OF THE M. E.
CHURCH.

KELLY and others *v.* THE SAME.

KELLY and another *v.* THE SAME.

*(District Court, D. Oregon.* December 3, 1879.)

1. GRANT TO MISSIONS IN OREGON.

The grant to religious societies of mission stations in Oregon, contained in section 1 of the act of August 14, 1848, (9 St. 323,) is not confined to a single station to each society, but includes as many stations as were then actually occupied by each society for missionary purposes among the Indians.

2. PATENT—SURVEY.

A patent issued under section 2447 of the Rev. St., upon a survey not approved by the surveyor general, is void; and in case of a grant under section 1 of the act of August 14, 1848, the survey to be approved by the surveyor general necessarily involves the determination of the question, what is the quantity and boundary of the claim?

3. MISSION STATION.

The grant to religious societies contained in the act aforesaid of the missionary stations *occupied* by them in Oregon on August 14, 1848, not exceeding 640 acres, is not confined to the land actually enclosed and cultivated by them, but should be construed to include the maximum quantity at each station occupied by them; that is, *claimed* and *in any way used* by them, and not in the actual occupation of any one else.

4. OCCUPATION OF MISSION STATION.

" Occupancy " is a word of narrower signification than possession, and means to possess by laying hold of or being actually upon the thing possessed continuously and exclusively. Prior to August 14, 1848, the title to all lands in Oregon was in the United States, and therefore no person could have constructive possession of any portion thereof, or any possession thereof, or interest therein, except actual possession or occupancy; and when this was given up or abandoned, the relation of the party to the land was absolutely terminated.

5. MISSION STATION AT THE DALLES.

The Missionary Society of the M. E. Church established a mission among the Indians at Wascopum, near the Grand Dalles of the Columbia, in 1838, and in September, 1847, abandoned and transferred the same to Dr. Whitman, of the Presbyterian mission at Wailatpu, and never re-occupied the same. *Held,* that the society did not receive a grant of said station under section 1 of the act of August 14,

1848, because it was not at that date in the actual possession and occupation of the premises; that such occupation was a condition precedent to the taking effect of such grant, and therefore it mattered not whether the failure of the society to occupy the station in August, 1848, was voluntary, or was caused by the fear of hostile Indians.

6. PAYMENT BY CONGRESS.

The payment by congress to the missionary society of $20,000, in June, 1860, on account of the reservation of 353 acres of the Dalles mission station in March, 1850, for military purposes, and the loss or destruction of property thereon since 1847, by Oregon volunteers, Indians, or United States troops, did not have the effect to invest the society with the title to such station then or on August 14, 1848; nor was it even an admission that the society had any legal right to the premises, but only that it asserted some kind of a claim thereto which it was deemed expedient to extinguish; nor could congress, in June, 1860, by a direct recognition of a supposed prior grant to the society, affect the rights of others already acquired in the premises under the town-site and donation acts.

*James K. Kelly* and *N. H. Gates*, for plaintiffs.

*Rufus Mallory* and *John C. Cartwright*, for defendant.

DEADY, D. J. These three suits were commenced on September 18, 1877, in the circuit court for the state, in the county of Wasco. The summons was served by publication, and on September —— the defendant appeared and had the cause removed to this court, where they were entered on January 30, 1878. On April 9th there was a demurrer filed to each complaint, which was disallowed, and thereupon, by the direction of the court, on May 2d, the plaintiffs in each suit restated their case in the manner of a formal bill in equity. On August 12th the defendant answered the bills, and on September 20th the plaintiffs filed the general replication. In the course of the proceedings exceptions for impertinence were taken to both the bills and the answers, which were disallowed, and the questions raised thereby reserved for consideration upon the final hearing. On October 15, 1879, the causes were heard together upon the several bills, answers, replications, and the exhibits and depositions in each, and in No. 390 so far as they were applicable to the other two.

Before touching the grounds of the controversy between the parties it may be well to state their respective cases, so

far as they rest upon either the admitted facts or those established beyond controversy.

The defendant is a corporation formed under the laws of New York, and from 1838 to September, 1847, maintained a mission among the Wascopum Indians, on the south bank of the Columbia river, at the lower end of the Grand Dalles thereof, at a place since called "The Dalles," in what is now Wasco county; and on July 9, 1875, received a patent from the United States under section 2447 of the Revised Statutes for a tract of land containing 643.37 acres, including the ground occupied by the improvements made at such mission —less 350 acres thereof included in the military reservation —the same being parts of sections 3 and 4, in township 1, N. of range 13 W., and section 33, in township 2, N. of range 13 W. of the Wallamet meridian, as a mission station occupied by it on August 14, 1848, within the purview of the second proviso to section 1 of the act of that date, "to establish the territorial government of Oregon," (9 St. 323,) which provides "that the title to the land, not exceeding 640 acres, *now occupied as missionary stations* among the Indian tribes of said territory, together with the improvements thereon, be confirmed and established in the several religious societies to which said missionary stations respectively belong."

The plaintiffs claim that the defendant did not occupy this tract, or any portion of it, as a missionary station or otherwise, on August 14, 1848, or since September, 1847, and that therefore it was not within the purview of said proviso, and the patent to the defendant was wrongfully issued; and also that they are the owners of, and entitled to, the patent for certain portions of said tract, as hereinafter stated, and ask to have their several rights therein established and declared, and that the defendant be so far regarded as their trustee and required to convey to them accordingly.

In 1852 the place called "The Dalles" was occupied as a town site for the purpose of business and trade, and has been so occupied ever since, and in 1855 the county of Wasco caused the same to be surveyed into lots, blocks, and streets, and said survey to be recorded; that on January 26, 1857,

the plaintiff in No. 390—Dalles City—was made a municipal corporation, with boundaries including said town site; and on April 18, 1860, entered, at the proper land-office, the fractional north-west one-fourth of said section 3, containing 112 acres, and including the land so occupied as a town site, under the town-site law of May 23, 1844, (5 St. 667; 10 St. 306,) in trust for the several use and benefit of the occupants thereof, according to their respective interests, and now claims to be the owner thereof accordingly.

On November 1, 1853, Winsor D. Bigelow became a settler under the donation act upon 320 acres of the public land, including parts of the N. W. one-fourth and the S. W. one-half of said section 3, and now known upon the plats of the public surveys as donation claim No. 40, and resided upon and cultivated the same until February 16, 1860, and otherwise complied with the requirements of said act; that on December 9, 1862, said Bigelow conveyed an undivided one-third interest of a certain 27 acres of said donation to James K. Kelly and Aaron E. Wait, plaintiffs in No. 391; and on December 12, 1864, conveyed the remaining two-thirds of said 27 acres to Orlando Humason, who, on September 8, 1875, died testate, having devised the same to Phœbe Humason, his widow, and a plaintiff in No. 391, which 27 acres said plaintiffs, by reason of the premises, claim to own as tenants in common thereof.

On December 2, 1864, said Bigelow conveyed to said Kelly and Wait, the plaintiffs in No. 392, 46 town lots, within the limits of his said donation, and situated in what is known as the "Bluff Addition to Dalles City," which lots the plaintiffs in No. 392, by reason of the premises, claim to own as tenants in common thereof.

It is *claimed* by the defendant that in August, 1847, it agreed to turn over the missionary station at The Dalles, with the improvements thereon, to Dr. Marcus Whitman, the agent of the American Board of Commissioners for Foreign Missions, and then engaged as a lay missionary of said board at a place called Wailatpu, about 140 miles E. N. E. of The Dalles, upon the understanding that said board would main-

tain a mission there among the Indians, and that said Whitman would pay $600 for certain personal property belonging to the mission; that, in pursuance of said agreement, said Whitman gave the defendant a draft upon said board for said $600, and the defendant's agents and missionaries, between September 1 and 10, 1847, surrendered the station to said Whitman; that, owing to the death of said Whitman on November 29, 1847, said agreement was cancelled in 1849, by the surrender of said draft to the agent of said board and the "retransfer" of said station to the defendant, who thereupon resumed control of the same; that in June, 1850, the agent of the defendant went upon the ground and surveyed and marked the boundaries of the claim as he understood them to be; and that in 1854 the Rev. Thomas H. Pearne, its agent, notified the surveyor general of the territory of the claim of the defendant thereto; but said defendant substantially admits that from the delivery of said station to Whitman, as aforesaid, it never actually occupied the same for mission purposes or otherwise, and claims that it was prevented from so doing by the danger from Indian hostilities, growing out of what is known as the Cayuse war.

The commissioner of the general land-office authorized the surveyor general to hear and determine the conflicting claims of the defendant, Bigelow, and Dalles City to the premises, and on February 16, 1860, the parties appeared before him, and on February 2, 1861, said officer decided that the defendant had no right to the land in controversy; which decision, on an appeal to the commissioner, was, on February 7, 1863, affirmed. From there the case was carried by appeal before the secretary of the interior, who, on March 15, 1875, reversed said decision, and decided that the defendant was entitled to the premises as a mission station, and directed a patent to issue to it accordingly.

Section 2447 of the Revised Statutes, under which this patent issued to the defendant, is taken from the act of December 22, 1854, authorizing the issue of patents in certain cases, and only applies where there has been a grant by statute without a provision for the issue of a patent. In such

a case the section provides that a patent may issue for the grant "upon a survey thereof, approved by the surveyor general," and "found correct by the commissioner;" subject, however, to the qualification that "such patent shall only operate as a relinquishment of title on the part of the United States, and shall in no manner interfere with any valid adverse right to the same land, nor be construed to preclude a legal investigation and decision by the proper judicial tribunal between adverse claimants to the same land."

The patent in question expressly declares that it is issued to the defendant subject to this qualification. There is, then, no question in this case of the power of this court to investigate the grounds upon which this patent was issued, and to determine that they were insufficient or otherwise, either in law or fact, and decree accordingly. The patent and the subsequent action of the parties has had the effect to remit the case to this forum to try and determine to whom the patent should have issued for the portions of the tract claimed by the plaintiffs.

It is admitted that the plaintiffs are entitled to the patent for the portions claimed by them, unless the defendant was entitled to the tract as a mission station under section 1 of the act of August 14, 1848.

On April 30, 1853, the defendant, by its agent, Rev. Thomas H. Pearne, notified the land department of its claim to a mission station near Salem, in Marion county, the same being parts of sections 23 and 26, in town 7, of range 3 W., S. of the Wallamet meridian, and containing 97.39 acres, which claim was allowed.

And now the plaintiffs contend that under the act a religious society can only receive a grant of one mission station, and the defendant, having elected to take the station at Salem, is therefore barred from claiming the one at The Dalles. I do not think this is the most reasonable construction of the statute. It grants the land "occupied as missionary stations" to the several religious societies to which said stations respectively belong. It is true that this language would be satisfied with the grant of one station to each society.

But it is broad enough, in my judgment, to cover more, if more there were, and ought to have effect accordingly, unless there is some controlling reason to the contrary in the circumstances of the case. If it had been the intention of congress to limit the grant to one station to each society, such intention would have been more naturally expressed by saying, "the land occupied as *a* missionary station to each religious society to which such station belongs." And this construction is strengthened rather than otherwise by reference to the surrounding circumstances. For some years prior to the passage of the act of August 14, 1848, there were three religious societies engaged in missionary labors among the Indians in Oregon—the Methodist Episcopal, the Presbyterian, and the Roman Catholic. The first missionaries of the former came to Oregon with Weyth, in 1834, and established a mission at Wallamet, below Salem, which was afterwards removed to the latter place. Subsequently their numbers were increased, and they established missions at The Dalles, Nesqually, and Clatsop. The Presbyterian missionaries came to the country under the auspices of the American board in 1836, and established a mission at Wailatpu, near what is now called Walla Walla, with Marcus Whitman at its head. Afterwards they established missions at Lapwai and Spokan—all east of the Cascade mountains. The Roman Catholic missionaries came from Canada with the Hudson Bay train in 1838. They established the mission of St. Paul, in the Wallamet, near Champoeg, and Cowlitz, on the Cowlitz river. Later they established missions in eastern Oregon, and held occasional missionary services among the Indians at many points in the country. In June, 1848, they established a mission at The Dalles, to the west and adjoining the land in controversy.

The country in which these grants were made was an immense territory, extending from the forty-second to the forty-ninth parallel of north latitude, and reaching from the Rocky mountains to the Pacific ocean. Outside of these missions and the Hudson Bay posts, practically, it was unoccupied, except sparsely in the Wallamet valley. The missionaries

were very properly regarded as having promoted the settlement and civilization of the country, and there was no reason why, if congress saw proper to recognize their services either as settlers or missionaries by granting them the land occupied by them as mission stations, it should confine the grant to one station to each society when more were occupied by it.

It is also insisted that this patent is void, as not having been issued upon "a plat of survey thereof" approved by the surveyor general, but upon the survey made by the agent of the mission in June, 1850. I think it is plain that a patent issued upon a survey or diagram not approved by the surveyor general would be void. For instance, a patent could not lawfully issue upon the survey of the claim by the society itself, because a survey of the grant involved the question of how much land was occupied by the mission, and within what limits. To allow the society to do this would be to make it a judge in its own case.

The grant was only of the land occupied, which might be less than 640 acres, and the surveyor general was required to ascertain the quantity and its boundaries before he could approve a survey thereof to enable the department to issue a patent therefor. When the surveyor general was authorized to hear the contest between these parties, on February 23, 1860, he directed a deputy surveyor to make a survey of the premises: (1) As claimed by the society; (2) as actually occupied by it; and (3) so as to include its improvements, with 640 acres south of the bluff, in substantially a square form. Plats of these surveys—the second one containing 87 acres—were forwarded to the commissioner by the surveyor general, with his decision that the society was not entitled to any portion of the premises as a missionary station. Neither of these "plats of survey" were *approved* by the surveyor general in the sense of the statute, because they were each made upon a hypothesis—that the society occupied the premises or some portion of them as a mission station on August 14, 1848—which he at the same time found not to be true. But on March 29, 1875, and after the decision of the secretary of

the interior, the commissioner wrote to the surveyor general advising him of such decision, and directing him to furnish that office with a "certified diagram of the claim of said society" as confirmed by the same. In obedience to this direction the surveyor general, on June 17, 1875, certified to the commissioner a diagram of the first of the three surveys, as being a plat of the survey of the Methodist mission claim at The Dalles, and upon this the patent was issued, as appears therefrom. Whatever, then, may be thought of the correctness of the survey, the proposition that the patent was issued without a plat of survey approved by the surveyor general, in the face of these facts, is not tenable.

It is also contended by the plaintiffs that if the defendant is entitled to take under the act as a missionary society at all, the grant should be confined to the land *actually* occupied by it.

This grant, unlike the one made by the donation act, is not of *the* 640 acres occupied by the donee, but of the *quantity* occupied, not exceeding that number of acres. Still it could not have been the intention of congress in the one case more than the other that the occupation of a donee should be limited to his actual enclosure and tillage. The donation act of September 27, 1850, (9 St. 497,) was in this respect a sort of supplement to the act of August 14, 1848, and did for the settlers at large what the former had done for the missionaries. It gave to the settler then residing in the territory, for himself and wife, the section of land which he had resided upon and cultivated for four consecutive years. But this residence and cultivation were not required to include the *whole* section. In fact, the actual enclosure and cultivation were often confined to a very few acres; while the remaining portion was only occupied for grazing, and sometimes hardly that.

Very early in the settlement of this country it became a cardinal rule that a settlement on the public lands should not include any more than a section. This was probably suggested by the terms of the Oregon bill introduced into the senate by Dr. Linn, of Missouri, in 1842, which, among other

things, proposed to give 640 acres of land to each white male inhabitant of the territory over 18 years of age. Prior to this time the missionaries had claimed large areas at their several stations, but as generally there was no one to dispute such claim, it mattered little one way or the other. In December, 1843, the mission at Salem was surveyed and platted at 16 sections. But on July 5, 1843, the people adopted a land law which limited the extent of a claim or settlement to 640 acres, with a proviso that any mission "of a religious character," established before that time, might contain six miles square. Or. Laws 1874, p. 50, n.

Under these circumstances I think the grant to the missionary societies ought to be construed to include 640 acres at each mission station occupied by them; that is, *claimed and used* by them, according to the circumstances of the time and place, and not in the actual occupation of any one else.

In the case under consideration there does not appear to have been any survey or marking on the ground of the boundaries or limits of the claim until June, 1850. But it was doubtless well understood by the occupants and the Indians that it should extend a certain distance in certain directions, or that it should include certain points or places,—as the improvements, the mill site, etc.,—though I do not think that it was ever expected or intended that it should extend north of the bluff, between which and the river, a distance of about half a mile, were the villages and camping ground of the Indians and voyagers up and down the Columbia river. And this brings me to the consideration of the question whether, upon the evidence, the defendant occupied this mission station so as to be entitled to the grant thereof under the act of August 14, 1848.

The evidence is somewhat meagre, and upon some points contradictory. It consists largely of the testimony of persons deeply in sympathy with the defendant, to facts and circumstances occurring 30 years ago, and scattered over a considerable period of time. The correspondence between the defendant and its agents here concerning the occupation and transfer of this station is not produced. It is presumed

to have been in writing, and within the knowledge and control of the defendant, and therefore the omission to produce it is a matter which must have more or less weight against the defendant, according to the circumstances of the case. Portions of the evidence partake of the character of hearsay, and some of it is decidedly argumentative. In considering it, it will be impossible to ignore the history of the period and place to which it relates. Reading it, then, by this light, and where it is contradictory or obscure supplementing it from this source, the material facts about the settlement and occupation of the mission station at The Dalles are these:

In the spring of 1838 the Rev. Daniel Lee and Rev. H. K. W. Perkins, under the direction of the Rev. Jason Lee, the superintendent of the defendant in Oregon, established a mission within the limits of the tract described in the patent herein, at a place then called Wascopum. In the fall of the same year it was stocked with cattle from the Wallamet valley. The place was favorably situated for trade and intercourse with the Indians and immigrants from the east—the latter usually, at this point, exchanging their wagons for boats, and often bartering their poor oxen for supplies, such as fresh beef and the like.

In 1840 Mr. H. B. Brewer went to reside there as a farmer for the mission. Perkins and Lee left the mission for the east in 1844, and the Rev. A. F. Waller joined it about the same time. Waller and Brewer remained there until the transfer of the station to Whitman, in 1847. In 1844 the Rev. George Gary superseded Jason Lee as superintendent of the Oregon mission. Apparently the society had become dissatisfied with the secular character and cost of the missionary operations, and sent Gary here to bring about a change in this respect. To this end, soon after his arrival in the territory, the various mission stations, except The Dalles, and all the mission property, consisting mainly of large herds of horses and cattle, were disposed of to members of the mission; so that after 1844 the defendant had no "mission among the Indian 'tribes" in Oregon except at The Dalles. Thereafter the labors of its faithful clerical missionaries, of

whom but a few remained in the country, were devoted to the growing "white settlements" in the Wallamet valley.   In the language of one of them: "The finances of the Oregon mission were thus summarily brought to a close, and the mission was not only relieved of a ponderous load, but assumed a decidedly *spiritual* character."   Hines' Oregon, 242.

In July, 1847, Mr. Gary was succeeded as superintendent of the mission by the Rev. William Roberts.   Prior to this, and in the spring of that year, Mr. Gary had disposed of nearly all the live stock of the Dalles mission station, and was negotiating with Dr. Whitman for the transfer of the station itself.   Mr. Roberts, in continuation of the policy manifested by his predecessor, followed up these negotiations until in August an agreement was made for the abandonment or transfer of the station to Whitman, together with the sale of a canoe, some farming utensils, grain, and household furniture, for the sum of $600; and between September 1 and 10, 1847, Messrs. Waller and Brewer, the agents of the defendant, delivered the possession of the premises to Whitman, who took actual possession thereof, and placed his nephew, Perrin B. Whitman, a youth of 17 years, in charge, while he proceeded to his mission station at Wailatpu.

Dr. Whitman was not a minister, but at the time of the transfer of this station to him it was understood and expected that religious services and instruction would in some way be kept up there for the benefit of the Indians; but there was no legal obligation to that effect, nor did the defendant or its agents have any intention or expectation of returning or occupying the station, if such services and instruction were not furnished or otherwise.   In pursuance of the settled policy of the defendant, the station was absolutely and unqualifiedly abandoned to Dr. Whitman, without any reservation or right to resume the possession under any circumstances.   Dr. Whitman, whatever his purpose may have been in regard to the Indians, purchased the station primarily for himself and nephew, Perrin B., to whom he promised the west half of it if he would remain and take care of it until the spring, when the former intended to return there and make it his

permanent home. At the time the defendant abandoned this station there were about 70 acres under some kind of enclosure, about one-half of which had been under cultivation. There were six moderate-sized buildings upon the premises, a dwelling, meeting, school, and storehouse, barn and workshop, built of logs, except the dwelling, which was a frame filled in with adobe. The buildings were plain, and constructed mostly with Indian labor, and did not cost to exceed $4,000, at which valuation they were afterwards—on June 16, 1860—paid for by the United States, upon the claim and estimate of the defendant to that effect. See H. of R. Rep. No. 145, 2d Sess. 35th Cong.; 12 St. 44.

On November 29, 1847, Dr. Whitman and others were murdered at Wailatpu, by the Indians of that station, and this was followed by what is known as the Cayuse war, in which the people of Oregon, under the provisional government, undertook to chastise the Cayuse Indians for this massacre. By midsummer of 1848 hostilities had ceased and peace was established, and in the latter part of the summer the troops were withdrawn from the country and returned to their homes.

About December 16th, Perrin B. Whitman, who had remained in charge of the station at The Dalles, being apprehensive of danger, left for the Wallamet valley, taking with him Mr. Alanson Hinman, whom his uncle had sent there from Wailatpu in October as a farmer and housekeeper. A detachment of volunteers soon after occupied the premises, with the permission of said Whitman, and it remained in the possession of the troops of the provisional government until they were withdrawn from the country as stated. Thereafter, the premises remained unoccupied, except occasionally by passing travelers and immigrants, until the spring of 1850, when a military post was established there by the United States, and the premises included in a military reserve.

There never were any Indian hostilities at The Dalles of a general or serious nature, or within 100 miles of the place. The immigrations of 1848 and 1849 came through the country without molestation; and from early in 1848 there

was no more *danger* of Indian difficulties or hostilities at The Dalles, than there was prior to September, 1847.

In the spring of 1849 the news of the passage of the organic act, with the clause making a grant to missions, reached Oregon. The death of Whitman had prevented the occupation of the station at The Dalles by him, either for himself or as the agent of the American Board, or both. The draft of $600 which he had given upon the board in payment for it had never been presented. Whatever might be thought of the claim of the defendant there could be no ground for claiming the premises as a place *ever* occupied by the American Board as a mission station. Thereupon, about the last of February or first of March, 1849, an arrangement was made between the superintendent of the Oregon mission and Messrs. Elkanah Walker, Henry H. Spaulding, and Cushing Eells, three missionaries of the American Board, by which the station was retransferred to the defendant and the draft aforesaid cancelled; and this was done by the defendant, not with any view of resuming missionary work there among the Indians or otherwise, but solely to enable it to claim and obtain, if it could, a grant of the premises from the United States on account of its occupation prior to September, 1847, and the subsequent circumstances. To the same end, and to assist it in obtaining damages from the United States for taking a portion of the station as a military reservation, the defendant, on February 28, 1859, obtained from the American Board a formal deed of quitclaim to the premises; although, on November 3, 1858, Messrs. Walker and Eells, professing to act upon a power to them from said board, dated February 28, 1852, for a nominal consideration, had conveyed the premises, subject to the military reservation, to Messrs. M. M. McCarver and Samuel L. White.

Upon this state of facts there is no ground to claim that the defendant acquired the title to this station on August 14, 1848, under the act of that date. It had abandoned the place voluntarily, and without any expectation or intention of returning, and was no more within the purview or operation of the act than if it had never been upon the ground. The

grant only applies to such stations as were *occupied* on August 14, 1848. To occupy is to possess, not *constructively* but *actually*. The word is of more limited signification than possession. It is derived from *ob* and *capio*—*to lay hold of*—and means to possess by having hold of or being actually upon the thing possessed, continuously and exclusively. Therefore, there can be no such thing as *constructive* occupancy. But when one has the complete legal title to land, and is therefore entitled to the possession of the same in law, he is deemed to have it. *U. S.* v. *Arredondo*, 6 Pet. 743. But prior to August 14, 1848, there could be no such possession of lands in Oregon, because the legal title was in the United States. Occupancy or actual possession was the only interest any one then had in lands in Oregon, and when that was given up or abandoned, the relation of the party to the land was absolutely terminated, and it was open to occupation by the next comer as though the foot of man had never been upon it. *Lownsdale* v. *City of Portland*, 1 Deady, 1.

Prior to August 14, 1848, the only interest which the defendant had in the premises was that of occupancy or actual possession. It therefore could have no constructive possession of the land. If this actual possession or occupancy existed at the passage of the act making the grant, the title of the United States was then and thereby and on that occasion vested in the defendant, but not otherwise. The act makes the grant to take effect, not upon an occupation which preceded or followed it, but upon that which was contemporaneous with it. The grant was made upon the condition precedent that the defendant was then in the occupation of the premises. Intention or desire to occupy is of no avail; and for the want of this occupation there is no excuse or equivalent. Even taking the view of the matter sought to be maintained by the defendant, that it was prevented from occupying the premises on August 14, 1848, by Indian hostilities, still the case clearly falls within the ruling in *Ford* v. *Kennedy*, 1 Or. 166, in which it was held that the grant in section 4 of the donation act of 640 acres of land to married persons who had resided upon the same for four years prior

thereto, or to their heirs in case of their death before the patent issued, did not include the heirs of married persons who had died before the passage of the act, because, by the terms thereof, the grant was limited to persons residing in the territory at the time of its passage, then in being. So, in this case, the grant only applies to stations *then occupied* for missionary purposes; and if for any reason a station was not then so occupied, it is not within the purview of the act, it matters not now long or how effectively missionary opertions had been carried on there at some former period. The station at Wailatpu would in all probability have been occupied by the Presbyterian society on August 14, 1848, but for the massacre of the missionaries there on November 29, 1847. But this fact did not excuse or was not equivalent to such occupation. Therefore, in the passage of the act to organize Washington territory, passed March 2, 1853, when congress had this subject before them with reference to the missionary stations in the proposed territory, the grant was repeated in the terms of the Oregon act, with the addition of the words, "or that may have been so occupied as missionary stations prior to the passage of the act establishing the territorial government of Oregon." This change was manifestly made to meet the case of the Wailatpu mission, which was not occupied as a mission station on August 14, 1848, and upon the theory that for want of such occupancy it was not granted by the Oregon act to the society which Dr. Whitman represented during his residence upon it, prior and up to the time of his death. But such want of occupancy being neither the result of a voluntary abandonment or a fleeing like the hireling from the wolf, but of the death of the faithful occupant at his post by Indian treachery and violence, congress was induced to extend the terms of the grant so as to include that case.

But, as has been shown, there is not the slightest ground for saying that The Dalles station was abandoned by the defendant's missionaries on account of fear of the Indians, or that such cause prevented its occupation by them in August, 1848. On the contrary, they deliberately abandoned it with-

out any intention of returning, because of a change of policy on the part of the society; and if the act of 1848 had not contained the clause making the grants of mission stations as it did, it is morally certain that we would never have heard of this manifest afterthought, that Whitman was to keep up the missionary work at The Dalles, in some sense as the representative of and for the defendant, and that upon his death the station would have been re-occupied and held by it as a mission but for fear of the Indians.

But it is urged that congress has recognized the validity of the defendant's claim to this land by the passage of the act of June 16, 1860, (12 St. 44,) "for the relief of the missionary society of the Methodist Episcopal Church," which provided that there should be paid to said society "the sum of $20,000, upon filing in the proper department a release to the United States, to be approved by the attorney general, of all claim to the land embraced within the limits of the military reservation at The Dalles, in Oregon territory, and of all claim for damages for destruction of property on or near the said land by the United States troops or volunteers or Indians at any time anterior to the date of said release."

To fully comprehend the motive and scope of the act it is necessary to state that in 1854 the military reservation at The Dalles, which had covered a number of square miles, was, by an order of the war department, reduced to 640 acres, to be laid off in such a manner as least to interfere with private rights. In the execution of this order only 353 acres of the mission station, as surveyed in 1850 by the defendant, including all the improvements thereon, were embraced in the reservation. The society availed itself of this circumstance, and at once asked for compensation. The matter was referred by the department to Major G. J. Raines, then the post commander at the Dalles, who reported in favor of paying the society the sum of $20,000. On January 28, 1859, the house committee on military affairs also recommended such payment, which was to be in full satisfaction of the claim for the land, and also one for $4,000 for the destruction of property upon the claim. The committee state in

their report that it appears from the evidence that the society was in the "possession" of the land on August 14, 1848, and that, as soon as the danger from Indian hostilities admitted, it endeavored to "re-occupy" the premises, but the United States "troops had ere then taken possession" and included them in the military reservation.

The committee seem to have avoided saying that the society was in the *occupation* of the premises on August 14, 1848, but chose the more indefinite and convenient term "possession." In passing the bill, however, congress made no declaration on the subject. This is one of the matters alleged in the answer, which was excepted to as impertinent. So far as these suits are concerned, it only amounts to this: Upon the *ex parte* representations of the defendant, congress was induced to pay $20,000 in satisfaction of its claim for one-half of the premises, and the value of the improvements thereon, whether destroyed by the volunteers under the provisional government, the Indians, or the United States troops, and estimated by it at $4,000. As has been stated, no reasons were given by congress for the passage of the act, but, in fact, various ones may have and probably did influence the action of members in favor of the appropriation.

Probably the strongest consideration in its favor was the fact that although the defendant might not have been in the occupation of the station in August, 1848, still it had maintained a misson there for nine years prior to September, 1847, during a portion of which time the title to the country was in dispute, and therefore there was a strong equity in favor of its receiving some compensation in either land or money. Again, the very fact that the defendant is the representative of a popular and powerful religious organization, for whose good will and favor the average congressman in Oregon and elsewhere has a lively regard, may not have been without its effect on the result.

But, be this as it may, the action of congress in making provision for the payment of this claim cannot, under the circumstances, have the effect to invest the defendant with the title to the premises. In legal effect, all that was done

amounted only to a release by the defendant of its right, if
any, to the one-half of the claim occupied by the military,
and for damages for the loss or destruction of property,
which is not even an admission by the United States, to whom
the release was made, that the releasor, the defendant, ever
had any right to either, but only that it asserted some kind
of claim thereto, which it was deemed expedient to satisfy and
extinguish.   *Bright* v. *Rochester*, 7 Wheat. 548; *Watkins* v.
*Holman*, 15 Pet. 53; *Croxall* v. *Shered*, 5 Wall. 287; *Merry-
man* v. *Bourne*, 9 Wall. 600.

Besides this, one of the plaintiffs and Bigelow, under
whom the others claim, had already acquired rights in the
premises under the town-site and donation acts, which con-
gress could not deprive them of, even if they had been
parties to this proceeding which resulted in the payment to
the defendant.   Congress has the power to dispose of the
public lands, and to make compensation for private property
taken for public uses, but it has not judicial power, and
therefore cannot finally determine conflicting claims to land,
although arising under its own grants or laws.

But, since this payment to the defendant of $20,000, there
is no longer any cause for regarding it as even morally
entitled to anything from the public on account of its mis-
sionary operations at The Dalles.   In 1847, when the place
was abandoned by the defendant, it had no market value,
because, there being no white people east of the Cascade
mountains, except a few Presbyterian and Roman Catholic
missionaries, there were no other purchasers for it; and,
rather than let it fall into the hands of the latter, it was dis-
posed of to Dr. Whitman for $600.   And it appears that *he*
was induced to make the purchase, even at that figure, as
much to prevent the "priests" from getting hold of the posi-
tion as anything else.   In 1850, when the claim was taken
by the military, it probably could not have been sold with a
good title for $1,000; and even as late as 1854–5, when the
town had commenced to grow, the sum paid the defendant
by the United States for the one-half of it was probably more
than double the value of the whole of it.

The conclusion of the court is that the defendant did not *occupy* the premises on August 14, 1848, as a missionary station or otherwise, either by itself or the American Board, and that it was not deterred from so doing by the danger from Indian hostilities, but voluntarily abandoned the same before September 10, 1847, without any intention or expectation of re-occupying it under any circumstances, and therefore the patent therefor to the defendant was wrongfully issued; and the decree of the court will be that the defendant be declared a trustee for the several plaintiffs herein, for so much of the premises described in the patent as is claimed by them in their several suits, and that the defendant, within 90 days, by a sufficient conveyance or conveyances, containing proper covenants against its own acts, to be approved by the master of this court, release to the said plaintiffs, accordingly, all right and title to said premises, and that it pay the plaintiffs their costs and expenses of suit.